SAFWAY STEEL SCAFFOLDS CO. OF WISCONSIN v. PATENT SCAFFOLDING CO. et al.

No. 7038.

Circuit Court of Appeals, Seventh Circuit.

Jan. 2, 1940.

Rehearing Denied April 15, 1940.

Max W. Zabel, of Chicago, Ill., and S. L. Wheeler, of Milwaukee, Wis., for plaintiff-appellee.

George Bayard Jones, of Chicago, Ill., C. P. Goepel, of New York City, and George I. Haight and M. K. Hobbs, both of Chicago, Ill., for defendants-appellants.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

Appellee charged appellants with infringement of United States Patents to Uecker, numbered 2,043,498, and 2,125,830, both of which had been assigned to it. The first patent was issued June 9, 1936, on an application filed June 16, 1934. The second patent was issued on August 2, 1938. The bill sought an accounting for damages and the answer was invalidity and noninfringement. Claims 2, 5, 9, 15 and 17 of the first patent were held valid and infringed. Three claims of the second patent were held invalid and not infringed. No appeal was taken from the decree with respect to the second patent, and this appeal relates only to the court's ruling with respect to the first patent.

The invention more particularly relates to a scaffold of the type used in the erection, repairing and painting of buildings. Its object was to provide a scaffold erectable with a minimum amount of time and labor and to reduce the fire and breakage hazard. Further objects of the invention were to provide a rigid scaffold of any height, in which the danger of collapsing from loose joints was reduced to a minimum, upon which planking might be placed at convenient elevations, and which might be readily erected and taken down by unskilled labor, and transported and stored.

The invention contemplates providing a unit of a built-up scaffold, including a pair of integral end frames joined together by a pair of braces, which are connected to each other intermediate the frames, thus maintaining the frames in spaced relationship. It further provides the scaffold with an interchangeable footing which will adapt it for use either as a stationary or a rolling structure. It further provides an end frame which may be inverted, and which has permanent integral members including a pair of vertical posts connected by a pair of horizontal supporting braces adapted to receive and support scaffolding planking at a plurality of levels on the frame.

The scaffolding unit comprises a pair of rigid end frames connected by a scissors, or an X-bracing. The end frames have a pair of vertical posts made of tubular material connected by a pair of horizontal supporting braces, which may be either tubular or of other shapes suitable to withstand the loads imposed by the scaffold planking and men working thereon. These braces are re-enforced by diagonal braces to form a light, rigid end frame. The diagonal braces preferably intersect the horizontal ones intermediate the ends thereof to assist the latter in carrying the load of the men at work.

The parts of the end frame are connected integrally, by suitable means, so as to form a strong, light frame which can readily be handled and erected by one man. The horizontal braces are adapted to support the scaffold planking which is firmly secured to the scaffold. This is accomplished by securing a wood retaining strip on the upper side of the horizontal braces by means of straps secured to the horizontal braces by welding or by removable clamps.

The upper horizontal brace is attached to the posts adjacent the upper ends thereof while the lower horizontal brace is connected below the vertical center of the uprights. The end frames being reversible, this positioning of the braces permits the scaffold planking to be supported at different elevations on both horizontal braces by inverting the frame. The lower ends of the vertical posts are provided with footings which may be either of a stationary or rolling character. For the former, the footing includes a bearing and an interiorly threaded sleeve therein which is held against rotation by a bolt, and the foot has a threaded shank which engages the threaded sleeve to form an adjustable footing. For the latter, the bearing receives the shank of a castor freely pivoting within the bearing, thus allowing the scaffold to be moved in any direction.

The X-braces are made of two compression resisting means, such as channels, back to back; or of two tubular means, or of other structural shapes, the channels being connected by a pivot which permits the X-braces, when not in use, to be folded for convenient transportation. These X-braces are connected to the vertical posts by means of bolts which pass through the posts and have wing nuts on the ends of the bolts for retaining the braces.

The scaffold is built up to any height by superimposing end sections upon the end frames and connecting them with the outer ends of the X-bracing. The connection between the superimposed end sections is formed by plugs having tapered ends adapted to guide the tubular ends of the posts into alinement, and a collar holds the plug in position between the superimposed vertical posts.

The scaffold may be built any desired length, in which case the X-bracing may be used in a staggered manner, which is preferred on account of economy, or it may be used in each pair of end frames.

The claims [1] are combinational in their character. It is contended by appellants

---

[1] "2. An end frame for a built up scaffold comprising, a pair of spaced uprights, a pair of spaced supporting braces connecting said uprights and integrally joined thereto, one of said braces being adjacent the upper end of said uprights and the other spaced from the lower end of the uprights whereby the frames may be inverted to support planking at different elevations on the frame, and diagonal braces on said frame co-operating with said supporting braces and said uprights to form a rigid frame."

"5. A scaffold of the character described comprising, a first pair of integral end frames, a brace joining said end frames to maintain the frames in spaced relationship, said brace comprising two members connected to each other intermediate said frames, a second pair of integral end frames superimposed on said first pair, a brace connecting said second pair of end frames to each other to maintain said second pair in spaced relationship, and means to connect the top of the lower pair of end frames to the bottom of the upper pair of end frames to maintain the frames of the upper pair in alinement with those of the lower pair."

"9. A scaffold of the character described comprising, a first pair of integral end frames; a brace joining said end frames to maintain said frames in spaced relationship; a second pair of end frames each end frame including a pair of cross members adapted to support planking at two elevations on the frames and invertible to support scaffold planking on said cross members at other elevations, said second pair of end frames being superposed on said first pair; means joining the lower ends of the upper pair with the upper ends of the lower pair; and a brace joining the second pair of end frames to maintain the same in spaced relationship."

"15. In a sectional scaffold of the type adapted to be increased in height by the addition of sections thereto, a section comprising, a pair of end frames spaced from each other, each end frame including a horizontal member adapted to support scaffold planking and a vertical post integrally joined to each end of said member, each of said frames being formed to secure a second frame superimposed thereon, a pair of pins connected to each of said posts, a collapsible brace comprising a pair of members pivoted to each other adjacent the centers thereof and provided with the holes in the opposite ends engageable over the pins on one post of each frame, and releasable means to maintain the brace secured on the pins whereby the end frames are held in spaced relationship."

"17. In a sectional scaffold of the type adapted to be increased in height by the addition of sections thereto, a section comprising, a pair of end frames spaced from each other, each end frame including a horizontal bar adapted to support scaffold planking, a vertical tubular post integrally joined to each end of the hori-

that claim 2 is void for want of invention, and that it is anticipated by patents No. 1,742,236 to Cornuelle, and No. 578,217 to Cummings.

Claim 2 comprises a pair of spaced uprights integrally connected by a pair of spaced horizontal supporting braces, one of which is adjacent the upper end of the uprights, and the other spaced from the lower end of the uprights, but below their vertical center, as specified and practiced. By these means the frames may be inverted to support planking at different elevations. Diagonal braces are placed on the frame so as to cooperate with the supporting frames and the uprights in order to form a rigid frame. The specifications disclose that the vertical posts and the horizontal braces are made of tubular metal and the diagonal braces are circular metal rods. All of these elements are joined at their connections by welding. The diagonals extend from near the center of the upper horizontal brace and connect with the uprights a short distance from the lower ends of the uprights, thus intersecting the lower horizontal brace. The elements of this claim are not only all old in the art, but they produce no new result, and if the claim is to be sustained it must be on the theory that it accomplishes an old result in a more facile, economical and efficient manner. New York Scaffolding Co. v. Whitney, 8 Cir., 224 F. 452; Young Radiator Co. v. Modine Mfg. Co., 7 Cir., 55 F.2d 545.

This claim merely covers the end frame of the built-up scaffold which is described in the other claims. Aside from its use in the scaffold, it could hardly be considered as arising to the dignity of invention. However, there is much substantial evidence in the record to support the finding of validity when used in the scaffolding structure; especially is this true when considered from the standpoints of facility, economy and efficiency. Without such evidence it would be most difficult to say that the disclosure involved anything more than mere mechanical skill. We cannot, however, disregard the evidence in this respect. In distinguishing between mechanical skill and invention, we must be guided by the import of those terms at the time the patent was granted, for in this age of rapid growth skill is not a static term. To one not skilled in the art, either now or formerly, the disclosures of this claim, on account of their simplicity, would seem to be obvious to anyone of average ability; but this is not a fair test, and our limited experience furnishes no better proof of its unfairness than the evidence here disclosed. Scaffolds have been built from time immemorial and those built of sectional units are quite old in the art, but the undisputed testimony of adverse witnesses in this case proves conclusively that the structure of this patent, as well as the end described in claim 2, answered a longfelt want in the construction of scaffolds, and from this evidence we think the answering of that want was due entirely to the fact that the scaffold could be built in a more facile, economical and efficient manner. We cannot disregard this testimony, for it comes from adverse witnesses who for years have been well informed in such structures. It is clear that they possessed full knowledge of all the elements here disclosed and of the various uses to which they are put in this disclosure, and yet throughout all the years neither they nor anyone engaged in this sort of work had ever conceived of the simple structure here disclosed and its splendid accomplishments, but they continued to use the same elements according to their old methods with a greater expenditure of time, labor and material.

Appellant further contends that the claim of invertibility, which was later inserted in the claim, was wrongfully inserted because it was not supported by affidavit. No new structural element was inserted, but it was merely an insertion of an added advantage of the structure originally described in the claim. We do not understand that the statute requires a supporting affidavit to such an amendment. Under these circumstances, accompanied by the presumption of validity, and the commercial success which follow-

zontal bar, said tubular posts being adapted to receive and support tubular couplings to receive other sections superimposed thereon, and diagonal braces integrally joining said horizontal bar with said posts to form a rigid end frame; and a cross brace joining a post of one said end frame with a post of the other said end frame, said cross brace including, a member connecting the posts, and a second member pivoted to the first member and connected to one of said posts."

ed and continued, we think the District Court did not err in holding the claim valid.

We are not unmindful of the prior uncited art such as Zaiser, No. 7,791; Bonenberger, Nos. 1,109,505 and 1,138,838; Delfs, No. 1,890,029; and Horn, No. 1,211,446. All of these were old and well known, and the adverse witness, Mr. Frost, who had considerable to do with the design and fabrication of the accused structures, knew of these prior disclosures and was well acquainted with the disclosures of the patent files relating to scaffolds. For some time he had manufactured under the Bonenberger patent and had devoted much of his time to looking for some method of construction which would be more facile, economical and efficient, but neither he nor any of his mechanics was ever able to accomplish his desires in these respects until he had seen the structure of the patent. This is quite convincing that the disclosures of the patent amount to more than mechanical skill within the meaning of that word at the time the patented structure was disclosed.

The other claims in issue relate to the structure as a whole, in which the end frames described in claim 2 are used. Claim 5 stresses the pivotal connection of the X-braces, the superposing of a second unit of integral end frames upon the first pair, and means to connect the top of the lower unit to the bottom of the upper one. Claim 9 more particularly refers to the cross members adapted to support planking at two elevations, and still another and different elevation by inverting the unit. Claim 15 likewise refers to the superposing of other units and to the collapsible X-braces which are pivoted to each other adjacent to their centers. Claim 17 likewise refers to the tubular couplings of the sections or units and the pivotal connection of the X-braces.

What we have said with respect to claim 2 may be considered as applicable to these claims, and we think that, under the evidence before us, there was no error in holding the claims valid.

The question of infringement, however, presents a more serious question. There are two accused structures whose end frames are identical in construction. The end frame in the accused structures, like those of the patent in suit, consists of two tubular vertical posts connected by two horizontal braces, one of which is adjacent the top of the upright posts; the other is considerably smaller in diameter than the top horizontal brace and is parallel to it. Instead of being spaced a short distance from the bottom of the posts, it is positioned from the upper horizontal brace at about one-fourth the distance from the top to the bottom of the uprights. Intermediate these horizontal braces is a series of latticed braces of material much smaller in diameter than the horizontal braces which they connect. From the bottom of the lower horizontal brace a diagonal brace extends to each upright post at a point a little more than halfway from the top of the upright to its bottom. The tops of the diagonal braces are spaced a little more than one-third the length of the horizontal brace.

In all other material respects the first accused structure is practically the same as the patented structure, except that in neither of the accused structures was the superimposed structure secured to the one next to it by the X-braces.

The record does not disclose that the first accused structure was ever sold or used, and its manufacture was discontinued in a very short time. Thereupon appellant ceased to pivotally connect its X-braces and now uses a stringer to connect the tops of the X-braces in each unit, which stringer is comprised of the same material and is of the same dimension, except as to length, as that of the X-braces. This constitutes the second accused structure.

Appellee lays much stress upon the disclosure that the end frame provides three different floor elevations, two being furnished by the tops of the two horizontal braces, and the third by the bottom of the lower horizontal brace when the section is inverted. Appellant's structures are certainly not calculated to furnish any great advantage in this respect, because the horizontal braces are too close together and the latticed diagonals between these braces would certainly not permit a close joining of the floor parts. The same would be true if the section were inverted, due to the two diagonal braces and the light weight of the lower horizontal brace. Moreover, appellant has never used nor advised the use of its section as an inverted structure, but it manufactures its upright posts in many different lengths, thus accomplishing the same result with respect

to floor elevations, as appellee accomplishes by invertibility. Indeed, appellee likewise manufactures its upright posts in different lengths for the accomplishment of the same purpose, but it has made no claim therefor.

With respect to the end frame in the accused devices, the horizontal braces are quite close together, the top one being at or near the top of the uprights as in the patent, and the lower one is quite close to the top one and is a considerable distance above the center of the uprights. The lower halves of the uprights, as described in claim 2, have no brace whatever, except that the short diagonal braces extending from the lower horizontal to the uprights extend slightly below the vertical centers of the uprights. Whether the two horizontal braces of the accused structures joined by small multiple latticed braces, constitute one or two horizontal braces is of small consequence, because they do not constitute an equivalent of the patented structure under this claim either in design, effectiveness or economy. It is quite true that the accomplishment of rigidity of the frame of the patent was a result which added to its efficiency, but that fact would certainly not preclude another person from accomplishing rigidity in any other manner. If the contrary be true, it would be most difficult for anyone to construct an end to a scaffold unit with rigidity equal to that of the patent. Rigidity is not an element of the claim but it is the result of the elements which the patentee used, and for this reason it seems to us that the claim must be quite narrowly construed, for all the elements used in all the structures in issue are quite old in the art, and their combined uses produced no result which had not been well known since the time scaffolds were first used. Uecker positioned these elements with exactness and we think he should be confined to these positions within a reasonable degree, otherwise any equivalent end which comprises two uprights, two horizontals and two diagonal braces would be an infringement of the second claim. This would be too broad a construction upon which to base validity.

The District Court thought that the stringer connecting the upper ends of the X-braces was an equivalent of the pivotal connection at the center of the X-braces used by the patent. He said the bracing employed between the end frames of the patent, as well as that of the accused structure, comprised braces so connected as to make two triangles for rigidly maintaining the end frames at fixed spacing, and that appellant's stringer was the equivalent of Uecker's pivot. We are unable to discern equivalency in this, or even analogy. The patentee said he used the pivotal connection in order that the X-braces might be folded in scissors fashion for convenience in transportation, and but little if any stress was laid upon the pivot as a strengthening element. It is true that in the patent the X-braces comprise two triangles, the uprights forming the bases and the pivot forming the apices. The same triangles are of course present in the accused structures, but without pivot, as they are in all X-braces. Moreover, appellant has a third triangle with the same apex as the others, but whose base is the stringer which connects the upper extremities of the X-braces. Indeed, the accused structures contain two more triangles. They are right angle triangles whose hypotenuses are the members of the X-braces. We think there is no infringement in this respect.

The tubular connections between the sections, which are very old in the art, are practically the same in all the structures in issue, and no claim, except in combination, is made for this particular element.

Moreover, it would seem that the second accused device is less economical in construction than that of the patent, because more metal is used in it and the section when completed is heavier than that of the patent. It is true that the difference in weight of the two sections is comparatively slight, but in a structure of many sections the difference would be considerable.

We think there is no infringement as to either of the accused structures. The decree of the District Court in this respect is reversed, but it is affirmed as to validity.

TREANOR, Circuit Judge.

I believe that the claims of plaintiff's patent are invalid; but granting validity I agree with the major holding that there is no infringement.