**M & R DIETETIC LABORATORIES, INC., Plaintiff,**

v.

**DEAN MILK COMPANY, Defendant.**

**No. 55 C 330.**

United States District Court
N. D. Illinois, E. D.
Nov. 21, 1961.

Sidney Wallenstein, Wallenstein, Spangenberg & Hattis, R. Howard Goldsmith, Schneider, Dressler, Goldsmith & Clement, Chicago, Ill., for plaintiff.

Thomas C. McConnell, Dugald S. McDougall, Herman I. Hersh, Theodore R. Scott, Chicago, Ill., for defendant.

ROBSON, District Judge.

This suit involves Patent No. 2,503,-866, issued April 11, 1950, on an application filed November 2, 1946.[1] The patent concerns a "preparation of a stabilized cream product," a dried cream[2] product usable directly in hot coffee.

■ A study of the evidence and legal precedent impels the Court to conclude that the process and product claims, claims 1–3 and 15–25 of the patent, are valid when limited to the precise ion exchange process disclosed therein, and the product of that process, is valid when conforming to the specified chemical pro-

---

1. This is a continuation-in-part of an application filed June 14, 1945.

2. Not true dried cream but enriched dried milk.

portions. The Court is further of the opinion that claims 26 and 27 are invalid.

The patented product allegedly obviates the theretofore objectionable characteristic of "feathering" on use in coffee, of the dried product, (or on its being reconstituted into a liquid), and retaining good flavor and low salt characteristics. Feathering is an objectionable scum caused by the reaction of the dried cream powder to the heat and acid of coffee. Defendant's product is a dried blend of rich cream and acid-curd sodium caseinate[3] to which lactose and disodium phosphate have been added before drying.

The essence of the plaintiff's invention is its claimed revelation of the need for reduction, within specified critical limits, of the amount of calcium in the product, coupled with the establishment of the precise permissible ratios of calcium to phosphorus, in order to prevent feathering. All the process claims here in issue achieve the desired result by the ion exchange method.[4] Its product, claims 26 and 27, broadly delineating the chemical proportions, are not limited to the ion exchange process.

The patent in suit discloses a reduction of the normal amount of calcium in the milk product by an ion exchange process by the filtering of the milk through a sodium material, with the resultant effect of the sodium passing to the milk in the exchange and the calcium passing to a filtering bed. A second step is then taught by the patent whereby the resultant milk is again treated by an ion exchange using a hydrogen cycle which restores the pH[5] of the product. This is important because if the strong salt taste were permitted to remain in the product it would dampen the bouquet of the coffee flavor. After relating the purpose of the invention,[6] the patent goes

---

3. Milk is about 87% water, 4% butterfat and 9% "milk solids not fat," which include casein, albumin and globulin, lactose, and inorganic chemical elements, including calcium, sodium, phosphorus and postassium. Sodium caseinate is derived by the chemical process of precipitating the casein in skim milk with an acid making an acid-curd and the liquefication of the acid-curd by neutralization with an alkali such as sodium bicarbonate or sodium hydroxide.

4. Ion exchange method is a process wherein one element is exchanged for another with no other material change in the chemical composition of the material affected.

5. Term used in expressing relative acidity and alkalinity.

6. The patent relates to "heat and acid stable milk products * * * and to the methods of making the same. In its more limited aspect it relates to a * * * coffee cream * * * having a protein content of greatly increased stability to heat and/or acids * * * with particular reference to dried cream and to the method of making the same, * * * but * * * is applicable to the preparation of other milk products * * *. "The treated dried creams * * * are stable and can be reconstituted readily to produce stable products. Either the dried cream product or the re-constituted product may be used to cream hot coffee without forming a heavy scum or 'feather' on the surface. These cream products are characterized by having a low concentration of salts and a protein content stable to heat and/or acids such as are encountered in hot coffee. * * * Because of the low salt content our creams do not dampen the coffee bouquet * * * as is the case with reconstituted dried creams prepared in accordance with prior art methods.

"* * * Upon the addition of these prior art cream products to hot coffee the cream 'breaks' with the result that a part of it precipitates to the bottom of the cup, some remains in suspension and some forms a heavy scum or 'feather' on the surface which is mingled with a considerable amount of freed butterfat or oil. Apart from the resulting unappetizing appearance, the coffee is only slightly whitened or creamed."

The patent states the invention as subjecting the milk to a succession of treatments with ion-exchange materials to reduce the salt content and at the same time stabilizing the milk protein to heat. Alkalinity and acidity are preferably developed solely by ion-exchange materials. The patent further surmises that the stability of its cream products "* * * is largely due to the presence in the cream of a milk solids not fat content having a markedly lower calcium content

on to recite that stabilization of the cream protein could be accomplished by converting the casein to a soluble caseinate, but the chemicals used in accomplishing this remain in the dried cream

in the form of salts which dampen the coffee bouquet.

Claim 1 covers a process for producing a "milk material" and claims 2 and 3 a process for producing a dry cream prod-

than normal milk solids not fat and, in particular, a markedly lower calcium (as Ca) to phosphorus (as P) ratio in the milk solids not fat, which reduction in calcium and in the calcium to phosphorus ratio is brought about by the treatment of the milk solids not fat with ion-exchange materials * * *."

The specifications of the patent go on to point out that the "conditions for stability in hot coffee of the dried cream product * * * are more critical than for the reconstituted product."

The patent specifies that the dried cream product is stable when added to hot coffee when the calcium content is 20 to 45% of normal and the calcium to phosphorus ratio is in a range of 0.25 to about 0.55, and in the reconstituted product stability occurs when the calcium content is 20 to 70% of normal and the calcium to phosphorus ratio is about 0.25 to about 0.90.

The patent uses skim milk as an illustration because it was found that in the use of milk or cream some of the butterfat was retained in the ion-exchanger beds.

The patent teaches the modification of milk or milk solids by cation exchange of milk of a pH of about 6.5 to 6.9 acting in the sodium cycle, the typical cation exchange being Amberlite, ZeoKarb, Catex and the like. The treatment results in from approximately 20 to 60 to 70% of the calcium in the milk being replaced by sodium with the formation of a sodium caseinate in the skim milk, (which is carried over into the dried product). The patent specifications also reveal that the cation exchange treatment reduces the ratio of calcium to phosphorus, the reduction being primarily in the calcium, the phosphorus being removed to a substantially less extent. It said it might even be desirable to reduce the pH to a point "within the range commonly found in fresh whole or skim milk" by the addition of a suitable acid, or preferably by the use of cation exchange materials, acting, however, in the hydrogen or acid cycle, which would not increase the salt content of the milk. The specifications of the patent describe the rate of flow in the exchange bath, the depth of the bed, and the addition of cream or butterfat to

achieve the higher butterfat content in the dried cream powder.

The suggestion is made that the amount of calcium to be removed is alterable by enlarging the amount of milk subjected to per cubic foot of exchange, by acidifying the milk prior to treatment. The pH of treated milk may be reduced by agitation with cation exchange material in the hydrogen cycle. The method of reviving the exchange material for further use is described.

The specifications present five very detailed examples of the operation of the invention, and all pertain to cationic-exchange process of the product.

The patent extols the superior keeping qualities of the product and its stability on being added to commercially prepared products such as soup, where the addition of fresh cream would cause curdling.

The patent points out that the fat globules of the added butterfat are by its process coated with sodium caseinate produced in the demineralization process, giving more stability, and ability to color coffee, whereas "dried fresh cream prepared in accordance with prior art methods * * * 'breaks' or curdles when added to hot coffee." It continues:

"In addition to the foregoing, the creams of the present invention retain most of the lactose and albumin which are lost in the acid curd process of making sodium caseinate. While it is conceivable that butterfat globules can be coated with a sodium caseinate which is produced by treating casein with sodium hydroxide and the resulting alkalinity of the product reduced to a pH of about 6.8 by adding hydrochloric, citric, phosphoric or like acid, such a product is not the product of the present invention, for there is such a high increase in the salt content thereof as to make it practically useless for the purposes heretofore mentioned."

The patent states it is not intended to limit the scope of the use of the invention to dried cream powder, but is applicable as well to whole and skim milk powder where high stability is required. The patent also cautiously disclaims intent to limit its scope to the details of the illustrative examples, envisioning many variations in proportions and procedures and other details.

uct, treating fluid milk, skim or like milk products having a "substantially normal calcium and phosphorus content and a pH of about 6.5–6.8 with a cation exchange material operating in the sodium cycle, until the calcium content of the product is approximately 20 to 70% of normal and there is secured in the product a calcium to phosphorus ratio of about 0.15 to 0.75, thereby raising the pH of the product, and treating the resulting product with a cation exchange material operating in the hydrogen cycle until the pH of the original milk product is substantially restored." Claims 2 and 3 also provide for "condensing the treated product, adding an amount of butterfat or butterfat-containing material to the condensed treated product sufficient to give the desired fat content in the dried cream but not to increase the calcium to phosphorus ratio beyond the range of about 0.25 to 0.90, homogenizing the mixture and drying it."

A summary of claims 15 to 21 is as follows: (The parentheses indicate parallel varying phrases of the respective claims.)

| Claim | Phraseology |
|---|---|
| 15–21 | A process for producing— |
| 15, 16, 19, 20 | a cream product |
| 17, 18 | (dry cream) |
| 21 | (a milk material) |
| 15–20 | comprising treating skim milk and like milk products |
| 21 | (comprising treating a fluid milk product) |
| 15–21 | having a substantially normal calcium and phosphorus content and a pH of about 6.5 to 6.8 with a cation exchange material operating in the sodium cycle, until the calcium content of the product is approximately 20 to 70% of normal and there is secured in the product a calcium to phosphorus ratio of about 0.15 to 0.75 |
| 16, 17, 20, 21 | thereby raising the pH of the product, and treating the resulting product with a cation exchange material operating in the hydrogen cycle until the pH of the original milk product is substantially restored |
| 15 | condensing the treated product |
| 18 | (condensing and homogenizing the mixture and drying it) |
| 19, 20 | (condensing and homogenizing the mixture) |
| 21 | (and drying the completed product) |
| 15–19 | adding an amount of butterfat or butterfat-containing material to the condensed treated product sufficient to give the desired fat content in the cream |
| 15–20 | but not to increase the calcium to phosphorus ratio beyond the range of about 0.25 to 0.90, and homogenizing the mixture. |

The product claims 23 to 25 (resulting from the cation exchange process) in essence cover either a dry cream product, comprising a homogeneous mixture of butterfat and cation-exchanged milk solids not fat (or condensed fluid), having a content of calcium approximately either 20 to 70% of normal or 20 to 45% of normal, and having a calcium to phosphorus ratio ranging from either about 0.25 to 0.90 or 0.25 to 0.55.

Claim 26 reads:

"A dry cream product comprising a homogeneous mixture of butterfat and milk solids not fat having a content of calcium approximately 20 to 70% of normal and having a calcium to phosphorus ratio ranging from about 0.25 to 0.90."

Claim 27 is very similar but with different proportions stated, thus:

"A dry cream product comprising a homogeneous mixture of butterfat and milk solids not fat having a content of calcium approximately 20 to 45% of normal and having a calcium to phosphorus ratio ranging from about 0.25 to 0.55."

It is the plaintiff's position that the invention of the patent was long sought for and especially needed with the development of coffee machines; that the prior art had recognized the problem of feathering, and even of the condition of high calcium content as causative thereof, but had not made the indispensable determination of the critical permissible limits of calcium, and the precise permissible limits, and the importance of the ratio of calcium to phosphorus. The tremendous commerical success is also cited as indicative of the inventive character of the patent.

Plaintiff claims that it has achieved a valid patentable combination with an altogether new and useful result,[7] of which there could be no anticipation unless all elements of the invention be found in a single patent, doing substantially the same work.[8] It states that neither British Burgess patent No. 542,846 (hereinafter referred to as Burgess), nor any other patent anticipates because to be anticipatory the teachings of the patent must be found within the four corners of the prior patent,[9] and expert testimony may not be utilized to reconstruct a reference.[10]

Plaintiff denies any disclaimer by its patent of a product made by acid-curd sodium caseinate, in that the statement in the patent upon which defendant's contention is predicated originated from abandoned experiments which did not relate to the criticality of the Ca$\div$P ratio, or reduction of calcium. It was a particular dried cream product high in salt content that was disclaimed as not within the patent. In fact, defendant is asserted to have followed the teachings of the patent by reducing salt content by careful washing, and it increased the phosphorus content lost in washing by adding disodium phosphate.

Defendant relies on the prior disclosures in U. S. patents No. 2,011,558 to Berlatsky; No. 800,255 to Wood; Nos. 2,045,097 and 2,225,506 to Otting, and British Burgess patent No. 542,846, as well as certain publications.[11]

Defendant states its product is an *artificial* blend of cream, acid-curd sodi-

7. Bryan v. Sid W. Richardson, Inc., 254 F.2d 191 (5th Cir. 1958).

8. Chicago Lock Co. v. Tratsch, 72 F.2d 482 (7th Cir. 1934).

9. Dewey & Almy Chemical Co. et al. v. Mimex Co., Inc., 124 F.2d 986 (2nd Cir. 1942); Badische Anilin & Soda Fabrik v. Kalle & Co. et al., 104 F. 802 (2nd Cir. 1900).

10. Naylor et al. v. Alsop Process Co., 168 F. 911 (8th Cir. 1909); Stead Lens Co. v. Kryptok Co., 214 F. 368 (8th Cir. 1914).

11. H. H. Sommer and E. B. Hart, The Heat Coagulation of Evaporated Milk, Wisconsin Research Bulletin, No. 67, 1926; H. H. Sommer, The Feathering of Cream in Coffee, The Milk Dealer, November, 1929; P. H. Tracy and H. A. Ruehe, Factors Affecting the Heat Coagulation of Homogenized Coffee Cream, University of Illinois Agricultural Experiment Station Bulletin No. 352, 1930.

um caseinate, and lactose, with disodium phosphate added. The product differs from the natural dried powder in that defendant's product has a protein content nearly all casein without substantial proportions of albumin and globulin of the natural product, and more lactose and phosphorus than the natural product. It states that the only differences between defendant's product and the prior art Berlatsky is that Dean adds lactose, and that Wood uses invert sugar (dextrose) instead of lactose, the natural milk sugar. Whereas plaintiff's patent surmounted the unwanted effect of salt in dampening the bouquet of coffee by using the chemical ion-exchange method, defendant utilized the prior art methods of carefully washing the acid-curd casein and then neutralizing it with sodium bicarbonate, as taught by Wood. In this washing process much of the calcium is removed as well as the lactose, albumin, and globulin. Since its product is made in accordance with the prior art, defendant contends it is immaterial that the patent claims may be "read" upon it.[12]

Defendant further points out the fact that plaintiff in its patent expressly disavowed "reconstituted dried creams prepared in accordance with prior art methods." The patent extols the superiority of its method over the prior art acid-curd process of making sodium caseinate in that its product retains most of the lactose and albumin which are lost in the acid-curd process. Defendant further states that claims 26 and 27 may not be construed more broadly than the process outlined in the patent and certainly not to cover a product made in a manner inconsistent with the process disclosed by the patent.[13]

### The Prior Art

The Burgess patent, No. 542,846, issued January 29, 1942, in Great Britain, concerned "Improvements in the Treatment of Milk and Products thereof," to better adapt them for human digestion.

In particular it dealt with *the method of reducing the calcium content* of the milk products without disturbing the other factors present to produce milk which did not form a dense curd. *The invention achieved this product by cationic exchange.* It stated that *the process reduced the calcium content of the milk,* but *the phosphorus remained the same,* and therefore *the phosphorus to calcium ratio was increased.*

There was a sharp conflict in the expert testimony on the Burgess patent, which states (p. 3, column 2, lines 94–104):

"As an example of the effectiveness of calcium reduction by the method of this invention, where an influent milk contained 0.1815% *calcium* the effluent milk contained 0.1030% *calcium,* representing a reduction of approximately 43%. In the same case, the phosphorus content of the influent milk was .098% and that of the effluent milk was also .098%. The treatment did not effect a change in the phosphorus content. As a result of the treatment, the phosphorus to calcium ratio was increased from substantially 0.54 to substantially 0.95. * * " (Italics supplied.)

The plaintiff's expert, Dr. Garrett, believed that when Burgess spoke of the 0.1815% calcium he meant calcium oxide because normal milk rarely had that high a percentage of elemental calcium. However, he further believed that when the Burgess patent stated the effluent milk had 0.1030% calcium, it meant elemental calcium because this was the usual value in ordinary soft curd milk. Plaintiff further states that if calcium be consistently read as CaO then Burgess' phosphorus to calcium ratio would have to be read phosphorus to calcium oxide ratio and obtaining a Ca:P ratio of .74 instead of a Ca:P ratio of 1.05, the only ratio stated in his patent, there-

---

12. Casco Products Corporation v. Sinko Tool & Mfg. Co., 116 F.2d 119 (7th Cir. 1940).

13. Texas Company v. Globe Oil & Refining Company, 225 F.2d 725 (7th Cir. 1955).

by making Burgess' "paragraph internally inconsistent."

Defendant maintains that to be consistent, if the word "calcium" in the first instance be taken to mean calcium oxide, it must be so read in the remainder of the sentence, and points out that when calcium is read CaO in the last sentence there is arithmetical corroboration of the construction in that a CaO content of 0.1815% in the influent milk does yield a phosphorus to CaO ratio of 0.54, and after 43% CaO removal the phosphorus to CaO ratio does become 0.95.

Plaintiff contends that inasmuch as there was a dispute between the experts as to the interpretation to be given Burgess, it could not be used as a reference.[14] Plaintiff also distinguishes Burgess as anticipatory because it concerns soft curd milks—an entirely different field from dry cream products with different problems.[15] Therefore it provides no teaching of the production of milk products stable to heat and acid nor how to achieve such stability. Plaintiff also rejects the Burgess patent as anticipation because the only Ca:P ratio given is stated to be 1.05, which is outside plaintiff's patent's limits.

Defendant contends that it was Dr. Garrett's interpretation of the Burgess patent, reading the word "calcium" as CaO the first time it appears in the disputed sentence, and thereafter as elemental calcium, which misled the Patent Office and induced it to disregard it as anticipatory.

The Court is of the opinion that the defendant's interpretation carries more conviction if it be true that elemental calcium [16] and calcium oxide do not have the same values, otherwise Burgess would have been inaccurate in the mathematics he specifies, but in fact he is mathematically correct if the word calcium be taken to mean the same in both instances.

The prior art Berlatsky patent No. 2,011,558, issued August 20, 1935, covered particularly a *condensed cream product* with the stated objectives of a concentrated cream product which "when added to hot liquids *will cream nicely, avoiding curdling and precipitation*" with good "keeping" qualities. Berlatsky recognized as well known that *"the casein constituent of milk and cream is curdled and precipitated by acids, especially when hot, as would be the case in hot coffee. * * * Even nominally sweet cream, if reduced to powder form will, if added to hot coffee, curdle and form objectionable casein specks."*

Berlatsky teaches (after re-establishing his one to one ratio of fat to non-fat by adding cream and compensating for it by the addition of an alkali caseinate), standardizing the acidity of the liquid, usually downward, by the addition of any suitable alkali, such as calcium or sodium hydroxide or di-or trisodium phosphate, sodium citrate or other acid-neutralizing agents. He claimed that because of the standardization of the acidity and balance of fatty and non-fatty solids, his product would not precipitate when utilized with a hot beverage.

Plaintiff distinguishes Berlatsky as not revealing the critical criteria of either claims 26 or 27; also, in that it fails to make any reference to calcium reduction or Ca:P ratios. Further, defendant's expert calculatingly selected a particular calcium content in making computations based upon the sodium caseinate, whereas the calcium content of sodium caseinate in fact varies greatly. Also, it would be impossible to determine the Ca:P ratio under Berlatsky because the calculation would have to depend in part on whether calcium hydroxide or di-or trisodium phosphate were used as the neutralizing agent. The patent could not be deemed anticipa-

14. Cimiotti Unhairing Co. et al. v. Comstock Unhairing Co. et al., 115 F. 524 (C.C.N.Y.1902).

15. Skelly Oil Co. v. Universal Oil Products Co., 31 F.2d 427 (3rd Cir. 1929).

16. There was evidence that 0.1815% CaO gives 0.127% elemental calcium.

tory when the result might only be fortuitously arrived at.

Plaintiff also impugns defendant's assertion that its expert calculated that if a sodium caseinate of Otting patent No. 2,225,506 were used in preparation of Berlatsky dry cream there could be achieved a product within limits of claim 26 by defendant's failure to disclose that the same expert had made other calculations which fell outside the claims.

Plaintiff insists Berlatsky's teachings are not followed by defendant because it does not balance fatty and non-fatty solids nor standardize acidity. It cannot escape infringement by reliance on Berlatsky because defendant fails to employ several of the process steps outlined by him including that of neutralization of acidity, and further, defendant uses certain amounts of disodium phosphate, not part of Berlatsky's disclosure.

Defendant states that the chief difference between its product and Berlatsky is that it neutralizes its acid-curd casein with sodium bicarbonate and adds lactose before drying.

The Otting patent No. 2,045,097, issued June 23, 1936, (assigned to plaintiff) concerns improvements in the *treatment of milk and milk products to effect a change or adjustment of the calcium* and phosphate content to adapt them for use in the preparation of infant's food, milk sugar and the like, in that the proportions of calcium and phosphates are excessively large to be easily digestible, because of large curds and "difficulty assimilable curds." The reduction of the calcium is effected by contact with adsorptive materials activated by treatment with an alkali for ion removal of calcium and phosphate. Otting specifies the ordinary amount of CaO and $P_2O_5$ in milk and the amount each is reduced by his process, it being a "substantial reduction." The acidity of the milk is maintained and slight additions of some innocuous acid such as lactic or pure sulfuric acid being made to compensate for the neutralizing action of the activated adsorptive material. He points

out the means for removing only the calcium or the phosphate ion.

The Otting patent No. 2,225,506, issued December 17, 1940, pertained to a method of preparing soluble caseinates. He pointed out that theretofore soluble caseinates made with an aqueous alkaline solution contained excessively large proportions of calcium and phosphates. He discloses that treating the casein with base exchange material which converts the insoluble casein into a soluble caseinate (sodium and/or potassium caseinate) and having relatively low proportions of calcium and phosphates. He specifies the materials usable as the base exchange materials. The casein may be procured by precipitation from skim milk by the usual method as by means of acid. On contact of the casein with the base exchange material the former is converted into a caseinate and dissolves in the medium in which it is suspended. The patent further states the material may be then dried and used in dry form. The product is particularly low in the proportions of calcium and phosphorus present, with remaining calcium oxide content approximately one-fourth and the phosphorus pentoxide content substantially less than one-half. It states the product is particularly suitable for use in food products.

Plaintiff distinguishes its Otting patent No. 2,045,097 on the basis that while it is possible to select numerical values within the broad ranges that fall within the instant patent, it is also possible to select some without the range. The only working example given in Otting is without the range, so is not a disclosure within the claims 26 and 27, and it makes no reference with respect to non-feathering dry cream powder. Further, it would have been unnecessary for plaintiff to seek a patent if the product were already covered by plaintiff's prior patent, or to have done the experimental work.

Plaintiff also points out that the only actual working example of the Otting patent No. 2,045,097 is of a final skim milk with a Ca:P ratio of 1.22, and this

cannot be taken as a teaching of the subject-matter of Claims 26 and 27.

Defendant refutes the non-anticipation of Otting Patent No. 2,045,097 (predicated on the fact the Otting patent does not mention non-feathering or the critical Ca:P ratio) on the basis that claims 26 and 27 also do not cover non-feathering, and each claim must stand or fall independently of the others.[17] Plaintiff, however, reads the claims in the light of the specifications disclosing non-feathering characteristics of the invention. Defendant further points out that Otting did disclose a product with a calcium content of 50% of normal and a calcium-phosphorus ratio of about 0.8, within the range of claim 26.

The Wood patent, No. 800,255, of the prior art (issued in 1905) covered a food compound of milk and invert-sugar, to which is added water, a very dilute acid, preferably hydrochloric acid, in proportion sufficient to precipitate the casein. The precipitate is filtered and washed; then it is mixed with sodium bicarbonate and tripotassium phosphate. The addition of the salts renders the casein soluble in water and supplies the necessary phosphate and sodium and potassium compounds. The patent specifications point out that a sufficient proportion of the calcium still remains in the mass from the "rather too-abundant proportion originally found therein." The butterfat is said to be readily assimilated. Wood suggests the addition of invert-sugar. He states the invert-sugar substitutes for the milk-sugar, and the sodium bicarbonate and tripotassium phosphate supply the loss in sodium, potassium and phosphorus and replace the excessive calcium and calcium phosphate removed from the casein. Wood also notes that his method of precipitation of the butterfat, casein, and other proteids of the milk, renders a large part of the calcium of the milk separable by the filtering and washing of the precipitate, and the butterfat comes down in a state of fine division and is so evenly distributed through the mass that it is in proper condition for complete emulsification when the sodium bicarbonate and tripotassium phosphate are incorporated. He states that in the milk deprived of a considerable part of its calcium, the sodium bicarbonate and tripotassium phosphate supply the loss in sodium, potassium, and phosphorus and replace the excessive calcium and calcium phosphate removed from the casein. He adds the invert-sugar as a part of the food compound to replace the milk-sugar, not for the purpose of taste.

Plaintiff points out that defendant does not follow Wood's teachings because it does not add water to whole milk but uses skim milk and therefore there is no butterfat to precipitate with the casein, upon the addition of hydrochloric acid; nor does defendant use Wood's mixture of sodium bicarbonate-tripotassium phosphate to render the casein soluble and for nutritional purposes, and argues that defendant adds disodium phosphate not for the same purpose but to achieve plaintiff's ratios.

Defendant claims that it makes its product in nearly the same manner as Wood, except for its use of lactose, whereas Wood used invert-sugar.

Dr. Sommer wrote an article in November, 1929, in The Milk Dealer, on "Salts in Milk and Their Importance in Dairy Work," part of which article concerned "The Feathering of Cream in Coffee." It stated that it had been recognized that feathering took place more readily in hot coffee than in hot water. The experiments further showed that the feathering increased with increased hardness of water and that both sodium citrate and disodium phosphate added to the cream counteract the effect of the hardness of the water. It was similarly found that the addition of calcium salts to the cream directly increased the tendency to feather and this was also counteracted by the addition of sodium ci-

17. Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp. et al., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005 (1935).

trate or disodium phosphate. The article advises that neutralizers of calcium of coffee cream must be avoided to prevent feathering. If feathering occurs in hard water it was recommended that small amounts of sodium citrate or disodium phosphate be added.

The Sommer and Hart article in 67 Wisconsin Research Bulletin, dealing with "The Heat Coagulation of Evaporated Milk" went into the background of the relationship of heat to coagulation, which it said was formerly thought to be dependent on the degree of the acidity of milk. It stated that:

"The fact that the calcium content of the milk is important in the heat coagulation was first demonstrated by adding ammonium oxalate to the milk which was known to coagulate in the heat test.

*"The removal of calcium by precipitation prevented the coagulation of the milk in the heat test.* The importance of the calcium and magnesium, and the citrates and phosphates in the heat coagulation was further demonstrated by the addition of these salts of numerous samples of milk. It was found that in the case of some of the milk samples the heat coagulation could be prevented by the addition of a suitable amount of sodium citrate, or di-sodium or potassium phosphate; in the case of other samples the addition of calcium acetate or magnesium chloride prevented the coagulation by heat. These observations lead to the conclusion that the calcium and magnesium on one hand, and the citrates and phosphates on the other hand, have opposite effects on the heat coagulation. *A proper balance of these two classes of milk constituents will prevent the coagulation of the milk in the heat test; an excess of either one of these two causes the milk to coagulate. Where the coagulation of the milk is due to an excess of calcium* or magnesium, *it can be prevented by the addition*

*of sodium citrate or di-sodium phosphate. \* \* \*"*

"If the soluble calcium salts are properly balanced with the citrates and phosphates, then the casein is held in solution even in an acid reaction.

"In applying our knowledge of the importance of the salt balance to cases where the troublesome coagulation is due to an unbalanced condition of the salts, only comparatively small additions of sodium citrate or di-sodium phosphate are necessary. \* \* \* We can conclude that the milk salts are the main factor in determining the heat coagulation of evaporated milk as well as in fresh milk. The remedy, the use of di-sodium phosphate to prevent troublesome heat coagulation, is already in extensive use. \* \* \*"

Tracy and Ruehe wrote on "Factors Affecting the Heat Coagulation of Homogenized Coffee Cream" in August, 1930. A preliminary study was said to have revealed that feathering in hot coffee did not occur where distilled water was used but did occur where well water was used, and that when well water was run through a water softener of Zeolite type no curdling resulted. It was concluded that the calcium mineral content of the water used in conducting the feathering tests caused coagulation of a part or all of the casein. It was found that the addition of a specified amount of sodium citrate reduced the feathering and that the addition of calcium chlorid increased the coagulation.

▮ *Re Validity of Claims 1–3 and 15–25.* Infringement of these claims is not involved because they pertain wholly to the ion-exchange process, which defendant concededly does not use. The state of the prior art outlined above, especially the Burgess patent, raises very grave doubt in the court's mind of the validity of these claims (as well as of claims 26 and 27) for want of inventiveness. The problem of feathering was acknowledged and its causative factors

had been thoroughly fathomed. The conclusions reached by the prior art were that the presence of calcium in quantity was the basic cause of feathering when the product (be it cream, evaporated milk, or dried cream) came in contact with heated water, or especially with hard water, and even more so when used in hot coffee. It is only because the court grants efficacy to the statutory presumption of the validity of the issuance of a patent (35 U.S.C. § 282), especially where the Patent Office considered (without misrepresentations) the prior art cited in these proceedings and issued the patent notwithstanding that prior art,[18] that it concludes in favor of the validity of these claims. Judge F. Ryan Duffy stated the rule most recently in AMP Incorporated v. Vaco Products Co., 280 F.2d 518, 521 (7th Cir. 1960):

> " 'The burden of proving a want of novelty is upon the party who avers it. * * * The patent is *prima facie* valid. * * * Furthermore, it is well settled that where the alleged invalidity is based upon a patent which was before the Patent Office and was rejected as an anticipation of the invention, the presumption of novelty and invention is greatly strengthened.' "

The court is not too impressed with the argument in support of the patent's validity of the tremendous amount of plaintiff's sales—in excess of $40,000,000 in over a decade—because it surmises that the $10,000,000 in advertising did have a powerful effect in producing this volume of sales.

The Patent Office had originally rejected the claims of the application as "substantially met by the art cited (which was the Otting patent No. 2,045,097,

the Burgess patent, and others) which teaches the selective removal of Ca and P ions from milk. * * * "

As the Court studied the expert testimony and the documentary exhibits, it was apparent that the problem of feathering in the milk industry was an old and recognized one; that its causative factors were well understood and its remedies grasped, or at least solvable by one conversant with the field. The Court is not too impressed with the differentiation between the various phases of the milk industry in which this problem was tackled, the chemical composition of milk or its derivatives being at the core of all the problems.

In view of the statutory presumption of validity, fortified as it is by the rule that the granting of a patent by the Patent Office despite the named prior art carries even greater weight, the Court concludes that the process and product claims of the patent, claims 1–3 and 15–25, are valid when limited to the precise ion-exchange process, and the product of that process, when conforming to the specified chemical proportions.

*Re Validity and Infringement of Claims 26 and 27.* These two claims, above-quoted, are in respect to a product having a calcium content, and a calcium to phosphorus ratio, within specified limits, irrespective of their being made by the cation exchange process. Plaintiff asserts infringement of claims 26 and 27 inasmuch as every element thereof is found in defendant's product in the second through fifth periods of manufacture, and that no more need be proved.[19] It claims that defendant, in September, 1945, bought its product, analyzed it, and experimented, beginning in October, 1948, utilizing the teachings of the plaintiff's

18. Saul v. International Harvester Company, 276 F.2d 361 (7th Cir. 1960); Anderson Company v. Sears, Roebuck and Co., 265 F.2d 755 (7th Cir. 1959); University of Illinois Foundation v. Block Drug Co. et al., 241 F.2d 6 (7th Cir. 1957); similarly, Day-Brite Lighting, Inc. v. Sandee Manufacturing Co., 286 F. 2d 596 (7th Cir. 1960); Hazeltine Research, Inc. v. Avco Manufacturing Corp., 227 F.2d 137 (7th Cir. 1955).

19. Graver Tank & Mfg. Co., Inc. et al. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Artmoore Co. et al. v. Dayless Mfg. Co., 208 F.2d 1 (7th Cir. 1953); Hunt et al. v. Armour & Co., 185 F.2d 722 (7th Cir. 1950).

Dr. Garrett's paper delivered in December, 1947. Defendant made a product admittedly by prior art acid-curd rather than ion-exchange method, but with reduced calcium and Ca:P ratios within the specific limits of the patent. Its addition of lactose is said not to exculpate it from infringement, and its change in process was not sufficient to insulate it from liability.[20] Plaintiff also states that defendant does not avoid infringement because its product lacks albumin, it not being essential in avoidance of feathering, but useful as a nutrient; therefore this slight deviation does not preclude a finding of infringement.[21] Plaintiff deems significant defendant's recognition of the validity of the patent by its efforts in December, 1948, to secure a license under it. The license negotiations fell through, defendant states, because it declined to agree to turn over improvements and because it believed the royalties exacted were too high. Defendant asserts that when claims 26 and 27 describe the patented product as containing specified amounts of "milk solids not fat," it must be taken as meaning the non-fat solids residual upon the process the patent defines and cannot comprise an artificial mixture of acid-curd sodium caseinate, added lactose, and salts introduced by a process which the patent disclaims.

Defendant points out that plaintiff would give a breadth of construction to claims 26 and 27 which encompasses milk-fats not solid constituents which have been chemically altered, that had been isolated from milk and then returned in different proportions than originally found in milk, or may have been derived from non-milk sources, such as Dean's disodium phosphate purchased from Monsanto Chemical Company.

It is further contended by defendant that the validity of claims 26 and 27 must stand or fall together inasmuch as there is no actual basis for the contention that the narrower limits prescribed by claim 27 and the broader permissible limits of claim 26 are justified even if the former be applied to dried milk used directly in hot coffee, and the latter applied to powder after liquefication, because Dean has found that its dried cream of even greater proportions does not feather when applied directly to hot coffee. Therefore the claims, with numerical limitations which alone distinguish them from the prior art, fall if the distinctive physical phenomenon occurs outside the specified limits.[22]

If claims 26 and 27 are broad enough to cover defendant's product it contends they are void because anticipated by Berlatsky and Wood patents, as those patents' teachings were elucidated by Dr. Hetrick. Further, it maintains that defendant's product is predicated on the teachings of those patents except that it improved thereon by eliminating the objectionable salt taste which prevented commercial success of the prior art. Defendant reiterates that if claims 26 and 27 are sufficiently broad in scope to cover it, they are invalid as anticipated by Wood and Berlatsky. Its defense is predicated on the elementary rule that that which infringes if later would anticipate if earlier.[23]

Defendant points out that the amendment adding claims 26 and 27, submitted October 13, 1949, and allowed October 28, 1949, was effected *after* Dean had commenced marketing its product. Such an amendment, it is said, cannot belatedly enlarge the scope of a patent.[24] Defend-

20. Graver Tank & Mfg. Co., Inc. et al. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

21. Illinois Central Railroad Company v. Turrill et al., 94 U.S. 695, 24 L.Ed. 238 (1877).

22. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973 (1945); Helene Curtis Industries, Inc. et al. v. Sales Affiliates, Inc., 233 F.2d 148 (2nd Cir. 1956).

23. Peters v. Active Manufacturing Company, 129 U.S. 530, 9 S.Ct. 389, 32 L.Ed. 738 (1889); Knapp v. Morss, 150 U.S. 221, 14 S.Ct. 81, 37 L.Ed. 1059 (1893).

24. Schriber-Schroth Co. v. Cleveland Trust Co. et al., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938).

ant's evidence was that it experimented in January, 1949, on a process other than ion exchange, after the license negotiations failed. Its commercial manufacture and sale began shortly thereafter. The plaintiff interpreted defendant's experimentation as an admission of possible infringement of a valid patent, but defendant explains it as an attempt to avoid controversy.

The criticalness of the limits specified in claims 26 and 27 is believed by defendant to have been disproved by powders with a calcium range of 79% to 85% not feathering, and that to be non-feathering the powder must have the natural calcium caseinate replaced by an alkali or sodium caseinate, as taught by Berlatsky, and other prior art.

Defendant also contends that claims 26 and 27 are invalid even if construed as limited to an ion-exchange process, because not disclosing patentable invention over Burgess patent and Otting patent No. 2,045,097.

Defendant also contends that plaintiff's product claims must be limited to the cation exchange process. Inasmuch as it concededly does not use that process, it is not guilty of infringement despite the fact its product might come within the stated percentages of the product claims 26 and 27.

Defendant further asserts that it was not until *after* it had achieved and introduced its product that plaintiff procured the broad product claims specially tailored to cover defendant's product after plaintiff became aware that defendant had effected the desired product by a process other than ion exchange. Defendant also points out that the product claims 26 and 27 were rushed through the Patent Office without benefit of the study of that office with a supplemental application unsigned by the inventors and without supplemental oath of the inven-

tors and even without their knowledge. Plaintiff states that claims 26 and 27 were added on the suggestion of the Patent Office Examiner, and without necessity for supplemental oath of the inventors because the amendment was within the breath of the original invention and disclosure. Plaintiff further argues that defendant procured a sample of plaintiff's product, analyzed it, and then went to work to duplicate its success by a method other than ion exchange.

Plaintiff refutes the defense of non-infringement (that by defendant's use of disodium phosphate which is not a milk solids not fat and the addition of such components as sodium caseinate it avoids infringement) pointing out that although different processes are used by plaintiff and defendant they produce the same result.[25]

Claims 26 and 27 should not, plaintiff contends, be construed as restricted to products of cation exchange method inasmuch as there already were such claims in the patent and limitations which are recited in other claims will not be read into a claim which does not contain such limitations.[26]

It is the Court's conclusion that claims 26 and 27 are invalid. The Court believes that the amendment effecting these claims was an afterthought ostensibly made because of the thoughtful suggestion of the Patent Office Examiner, and not because it lay within the original conception of the inventors. They broadened the scope of the invention originally claimed and described in the specifications to cover a product not achieved by the ion-exchange method, without the support of a supplemental oath of the inventors, and without their approval. Furthermore, they were made by an amendment submitted many months after defendant's product appeared on the market.

25. Hunt et al. v. Armour & Co., 185 F. 2d 722 (7th Cir. 1950); General Electric Co. v. Laco-Philips Co., 233 F. 96 (2nd Cir. 1916).

26. Smith v. Snow et al., 294 U.S. 1, 55 S. Ct. 279, 79 L.Ed. 721 (1935); O'Brien v. O'Brien, 202 F.2d 254 (7th Cir. 1953); Holstensson et al. v. Webcor, Inc., 150 F.Supp. 441 (D.C.Ill.1957).

A very careful reading of the Chrysler-Almy patent in suit reveals throughout the specifications that the inventors contemplated only a product that was the result of the cation exchange process. Repeatedly they speak of "the present invention" in conjunction with the cation exchange process for producing the product. The examples detailed are of that process. It is clearly apparent that the inventors did not contemplate and did not conceive their invention to be other than a specified product of the cation exchange method.

The Patent Office Rules provide that

"When an applicant presents a claim for *matter originally shown or described but not substantially embraced in the statement of invention or claim originally presented, he shall file a supplemental oath to the effect that the subject matter of the proposed amendment was part of his invention, was invented before he filed his original application*; that he does not know and does not believe that the same was ever known or used before his invention or discovery thereof, or patented or described in any printed publication in any country before his invention or discovery thereof * * *. Such supplemental oath must be attached to and properly identify the proposed amendment." Patent Office Practice Rules, of 1947, rule 48 [now rule 67, 35 U.S.C.A.Appendix].

The substance of this rule or its predecessors has been passed upon many times in the courts. Where the amendment does not "enlarge" the claims no supplemental oath was held to be required,[27] nor is such oath required where the changes are "formal and immaterial" and the same invention is disclosed in the original application and the amended one.[28] A supplemental oath is not necessary when the amended claims "may fairly be derived from the original specifications."[29] Nor is a supplemental oath necessary where the amendments "presented claims for matter substantially embraced in the statements of invention or claims originally presented,"[30] or "the material features were all described in the original application."[31] A supplemental oath has been held to be required "only when an applicant claims some phase of the invention quite different from what was originally claimed."[32] It has been held that where no "new structural element was inserted, but it was merely an insertion of an added advantage of the structure originally described in the claim" no supporting affidavit was required for such an amendment.[33] When an amendment of specifications was made after an inventor's death the United States Supreme Court held that no new oath was required, "such amendment being within the scope of the original oath and description, and by way of limitation of the claims."[34] A claim which constituted "a departure from the invention originally specified, illustrated, and claimed" was held invalid as not covered by oath of the inventor.[35]

27. National Latex Products Company v. Sun Rubber Company, 274 F.2d 224 (6th Cir. 1959).

28. Alward v. Jordan Marsh Co., 111 F. Supp. 758 (D.C.Mass.1953).

29. American Safety Table Company v. Schreiber et al., 269 F.2d 255 (2nd Cir. 1959).

30. Flexwood Co. et al. v. Matt G. Faussner & Co., 145 F.2d 528 (7th Cir. 1944).

31. White Machine Company, Inc. v. Bon Ton Cleaners & Dyers et al., 190 F. Supp. 807 (D.C.N.J.1961).

32. Glade v. Walgreen Co. et al., 122 F. 2d 306 (7th Cir. 1941).

33. Safway Steel Scaffolds Co. of Wisconsin v. Patent Scaffolding Co. et al., 110 F. 2d 1008 (7th Cir. 1940).

34. DeLaVergne Refrigerating Machine Company v. Featherstone, 147 U.S. 209, 13 S.Ct. 283, 37 L.Ed. 138 (1893).

35. Cleveland Gas Burner & Appliance Co. v. American Heater Corporation, 38 F. 2d 760 (8th Cir. 1930).

■ Two older decisions from this Circuit reveal that no supplemental oath is required where the new claims "are within the invention as disclosed in the specifications and drawings, and *narrower* than the original claims,"[36] * * * or the amended application did not present a "conception materially different from or *enlarged* over that shown by the [original] application."[37] (Italics supplied.)

■ A patentee is entitled to broaden the scope of his claims "so long as the broadened claims are fairly supported by the disclosures of his original application."[38]

The statement of the Supreme Court in Schriber-Schroth Co. v. Cleveland Trust Co. et al., 305 U.S. 47, 57, 59 S.Ct. 8, 12, 83 L.Ed. 34 is extremely pertinent on this point. It was there said:

"The object of the statute is to require the patentee to describe his invention so that others may construct and use it after the expiration of the patent and 'to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' Permutit Co. v. Graver Corporation, 284 U.S. 52, 60 [52 S. Ct. 53, 55, 76 L.Ed. 163.] It follows that the patent monopoly does not extend beyond the invention described and explained as the statute requires, Permutit Co. v. Graver Corporation, supra, at 57 [52 S.Ct. at page 54]; that it cannot be enlarged by claims in the patent not supported by the description, Snow v. Lake Shore & M. S. Ry. Co., 121 U.S. 617 [7 S.Ct. 1343, 30 L.Ed. 1004]; cf. Smith v. Snow, 294 U.S. 1 [55 S.

Ct. 279, 79 L.Ed. 721]; and that *the application for a patent cannot be broadened by amendment so as to embrace an invention not described in the application as filed, at least when adverse rights of the public have intervened.*" (Italics ours in part.)

■ The amendment adding claims 26 and 27 was broader than anything theretofore disclosed in the specifications. It makes no reference to process and covers any product by whatsoever method achieved. Certainly such an amendment unsupported by a supplemental oath is invalid.

The unusual manner in which claims 26 and 27 came into being also fortifies the Court's conclusion that they resulted not from the brain of the inventors but from foresightedness of the Patent Office Examiner. The speed with which the amendment adding the two claims was effected viewed in conjunction with the other facts of seeming lack of investigation of the amendment by the Patent Office with respect to the prior art, absence of supplemental oath, or even awareness of the inventors of the amendment, impugns the statutory presumption of validity of the patent as to claims 26 and 27.

Significant too is the statement in an old Second Circuit case[39] that

" * * * [T]he plain effort of plaintiff to 'lick into shape some new claims that would read directly on what a competitor had just put out, is not attractive, and justly leads any court to scan closely claims so composed * * * they cannot be cast out, if they do naturally grow out of the specification."

When a similar contention was made in a case before this Circuit's Court of Ap-

36. General Electric Co. v. Morgan-Gardner Electric Co., 168 F. 52 (7th Cir. 1908).

37. Camp Bros. & Co. v. Portable Wagon Dump & Elevator Co., 251 F. 603 (7th Cir. 1917). Similarly, Michigan Carton Co. v. Sutherland Paper Co. et al., 29 F.2d 179 (6th Cir. 1928).

38. American Anode, Inc. v. Lee-Tex Rubber Products Corporation, 136 F.2d 581 (7th Cir. 1943).

39. S. S. Stafford, Inc. v. Thaddeus Davids Ink Co., 264 F. 111 (2nd Cir. 1920).

peals[40] the contention was found groundless and the specifications in the original application were held supportive of the amendments subsequently made. 9 C.J.S. Patents, § 212, p. 725, states the rule applicable to this situation thus:[41]

"* * * [C]laims allowed after their amendment and drawn to read on what a competitor had just put out cannot be disregarded where they are supported by the original specifications. Where the amendment has been added long after the application was filed and after other inventors acquired intervening rights, the claims should be closely scanned and strictly construed, and they may be limited to the invention disclosed by the original application."

■■■■■ Furthermore, while the claims of a patent are the sole measure of a grant[42] and not the specifications,[43] a patentee's broadest claim can be no broader than his actual invention, no matter how it may be expressed.[44] Judge J. Earl Major has said that a patent "grant cannot be broader than the invention described in the specifications,"[45] and Judge Win G. Knoch has said "a patentee's broadest claim can be no broader than the actual invention disclosed in the specification."[46] Claims are construed to exclude disclosures of prior art.[47] These claims go beyond the specifications by their all inclusiveness.

Some argument is made by defendant that claims 26 and 27 are invalid for lack of compliance by the Patent Office with its obligation to make a search in respect of the prior art as to the validity of the proffered claims 26 and 27. Plaintiff, however, argues that there is no evidence that such a search of the prior art re the amendment was not made and it would be presumed that the Patent Office complied with its own rules. The shortness of interval between the time of the submission of the amendment and the time of allowance might be indicative of a lack of such search, in addition to the fact that nothing thereon appears in the file wrapper.

Counsel are requested to confer and submit a draft of a final decree in conformity with the Court's finding of the validity of claims 1–3 and claims 15–25, and of the finding of invalidity of claims 26 and 27 of the patent. Counsel are also requested to prepare and file simplified findings of fact and conclusions of law to accord herewith. This is to be done within 30 days.

40. American Steel Foundries v. Damascus Brake Beam Co., 267 F. 574 (7th Cir. 1920).

41. See also Railway Company v. Sayles, 97 U.S. 554, 24 L.Ed. 1053 (1878).

42. Aro Manufacturing Co., Inc. et al. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed. 592 (1961); Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944).

43. Milcor Steel Co. v. George A. Fuller Co. et al., 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332 (1942).

44. Plax Corporation v. Precision Extruders, Inc. et al., 239 F.2d 792 (3rd Cir. 1957); Texas Company v. Globe Oil & Refining Company, 225 F.2d 725 (7th Cir. 1955); Kemart Corp. v. Printing Arts Research Laboratories, Inc., 201 F.2d 624 (9th Cir. 1953).

45. Texas Company v. Globe Oil & Refining Company, 225 F.2d 725, 735 (7th Cir. 1955).

46. Bowman Dairy Company v. Aerated Container Corporation, 152 F.Supp. 842 (D.C.Ill.1957).

47. Smith v. Mid-Continent Inv. Co., 106 F.2d 622 (8th Cir. 1939).