See also, D.C., 270 F.Supp. 57.

**Edmund C. NORVELL, Jr., Plaintiff,**
and
**Burgess Vibrocrafters, Inc., Involuntary Plaintiff,**
v.
**McGRAW–EDISON COMPANY, Defendant.**

Civ. A. No. 65–C–205.

United States District Court,
E. D. Wisconsin.

July 29, 1970.

---

Ira Milton Jones, and James R. Custin, Milwaukee, Wis., for plaintiff; Donald R. Fraser, Toledo, Ohio, of counsel.

Howard H. Darbo, Arlington Heights, Ill., for involuntary plaintiff.

Charles A. Prudell, Elm Grove, Wis., for defendant; James Van Santen, and Charles Lind, Chicago, Ill., of counsel.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

REYNOLDS, District Judge.

### Jurisdiction

1. This court has jurisdiction of the subject matter, including the counterclaim of defendant, and of the parties. This action arises under the patent laws of the United States, 35 U.S.C., and the antitrust laws of the United States, 15 U.S.C., and this court has jurisdiction pursuant to 28 U.S.C. §§ 1338(a) and 1400(b), also under 28 U.S.C. § 1332 and the declaratory judgment law, 28 U.S.C. § 2201.

### Parties

2. The original plaintiff, Edmund C. Norvell, Jr. ("Norvell"), of Bloomington, Minnesota, granted to Burgess Vibro-crafters Incorporated ("B.V.I."), an Illinois corporation doing business at Grayslake, Illinois, an exclusive license under U. S. Patent No. 3,069,092 issued to Norvell as patentee. B.V.I. was ordered by this court to join as an involuntary plaintiff upon motion of the defendant.

3. The defendant, McGraw-Edison Company ("McGraw-Edison"), is a Delaware corporation having a regular and established place of doing business in Milwaukee, Wisconsin, and having its headquarters in Elgin, Illinois.

### FINDINGS

#### Patent in Suit

4. The patent in suit No. 3,069,092 ("092") relates to a method of forming a dispersion of vaporized liquid insecticide (claim 1) and a so-called insecticide fogger (claim 2) and was issued December 18, 1962, on the basis of a continuation-in-part application Serial No. 168,-004 filed January 15, 1962. This application amended and replaced an

original application Serial No. 59,713 filed September 30, 1960 (parent application). The patent, Exhibit No. 1, is reproduced as "Appendix A" to this opinion.

5. Patent 092 discloses an insecticide fogger wherein a conventional B.V.I. paint sprayer is used to force liquid insecticide from a jar reservoir by a pumping action through an atomizing nozzle in spray form. A cylindrical heated barrel forming a vaporizer is attached to the paint sprayer.

6. The patent discloses two separate species. In the species of Figures 1–3, the barrel is mounted on the nozzle by a bracket, and a substantial axial space exists between the front end of the nozzle and the rear end of the barrel so that the spray discharged from the atomizing nozzle will aspirate air into the barrel to provide an air liquid mixture. That species was the only species disclosed in the original parent application.

7. In the species of Figures 4–7, an annular flange is added to the paint sprayer and the barrel is provided with mounting prongs to mechanically and electrically connect the elements in assembly with one another, thereby leaving an annular space between the external surface of the barrel and the annular flange, through which annular space air is aspirated for mixture with the spray prior to entry into the barrel. That species conforms to the B.V.I. commercial structure and was added to the disclosure in the continuation-in-part application filed February 15, 1962.

*Claims in Issue*

8. The patent in suit contains two claims, claim 1 being directed to a method of forming a dispersion of vaporized liquid insecticide and claim 2 being directed to an insecticide fogging device.

9. McGraw-Edison was originally charged with infringing both claims 1 and 2. Issue was joined on the complaint as well as on a counterclaim seeking a declaration of noninfringement and invalidity as to both claims.

10. The plaintiff attempted withdrawal of method claim 1, which procedure was the subect matter of some debate at the trial, and the court invited counsel for the defendant to submit a proposed order of dismissal. The plaintiff would not approve an order as presented, and separate briefs directed to that issue were submitted.

11. For purposes of these findings of fact and conclusions of law and this decision, both claims 1 and 2 are considered in the case under the defendant's counterclaim.

12. The two claims of the patent in suit read as follows:

Claim 1. "A method of forming a dispersion of vaporized liquid insecticide in a current of air comprising admixing air with a solid liquid atomized spray of liquid particles solely by the aspirating action of said atomized spray and passing the mixture thereby produced through an elongated cylindrical zone while radiating heat into the mixture from the boundary of said zone to effect vaporization of the liquid particles therein."

Claim 2. "A vaporizer for liquid insecticides and the like comprising means including a nozzle, a reservoir for the liquid, and means for delivering a solid stream of the liquid from said reservoir to said nozzle under pressure for ejecting from the nozzle solely liquid in an expanding cone of atomized spray; an elongate barrel aligned in front of and spaced a relatively short distance from said nozzle to define an annular embracive air passage about the periphery of said spray whereby a current of air is aspirated by said spray from said embracive air passage into said barrel and forced into intimate admixture with the spray; and means for heating said barrel to effect vaporization of the spray particles in the mixture of air and spray passing through said barrel

whereby the liquid spray entering the barrel controls the amount of air admixed therewith."

### The Issues

13. The issues are as to the validity and infringement of claims 1 and 2 and also alleged violation of the antitrust laws by the plaintiffs.

### The Accused Device

14. McGraw-Edison manufactures an insecticide fogger wherein an atomized spray of liquid insecticide is directed towards the interior of a heating tube. The McGraw-Edison fogger provides a nozzle which is located just inside of the heating barrel. Further, the McGraw-Edison fogger utilizes a motor-powered fan to forcibly pump a stream of air into the heating tube so that the insecticide fog is ejected from the outlet end of the heating tube.

### The Issue of Infringement

15. Method claim 1 specifies that the air passing through the barrel is determined "solely by the aspirating action of said atomized spray." Plaintiffs' engineering expert Oberto stated: "to me this means that if any outside source of air such as a fan is used to force air through the barrel, this claim is not infringed." That is the very limitation by means of which method claim 1 was amended to distinguish over the Austrain reference patent 175,972 cited by the United States Patent Office.

16. It was also represented in open court that the plaintiff and the involuntary plaintiff were willing to dismiss the suit with prejudice with respect to method claim 1.

17. As part of his early experimentation, Norvell made an insecticide sprayer with a nozzle inside of the barrel but Norvell found such device unsatisfactory because it dripped and there was a little vapor and some spray went through. In completing his alleged invention, Norvell moved the nozzle back to establish an axial spacing relationship between the nozzle and the barrel.

18. In the patent in suit, column 2, line 37 et seq., is described "a substantial space" which exists between the front end of atomizing nozzle 14 and the rear end of the barrel 17. That "space" was labeled on plaintiff's Exhibit 1 by Norvell and is also labeled by legend in the file wrapper as admitted by plaintiffs' patent expert Kohls. Norvell admitted he had no geometric terms he could apply to such "space." The parent application, as originally filed, September 30, 1960, makes no reference to the word "annular" or the word "embracive" or the term "annular embracive passageway" in connection with that space or any other part of the structure of operation of the Figure 1 species.

19. Kohls admitted that Figure 1 of the patent in suit was newly added by a continuation-in-part application except space embracing the cone of discharging spray which is no different than the open space in the prior art patent of Tomasovich 2.

20. Everything in the patent specification following line 11 of column 3 of the patent in suit was newly added by a continuation-in-part application except for the paragraph appearing in column 5 between lines 22 and 25. The figures shown in Figures 4–7 of the drawings were also newly added in the continuation-in-part application.

21. In the newly-added material, several references are made to features which are "annular" such as "an annular space defined by forwardly extending annular collar 58," column 3, lines 35 et seq., and to the operation of such device calling for air to be "aspirated to the aforesaid zone through the annular space between the outer surface of the casing 60 and the inner surface of the annular collar 58."

22. Both the inventor Norvell and the plaintiffs' patent expert Kohls admitted that the "annular space" through which the air is aspirated is the annular space between the collar 58 and the rear end portion of the barrel as labeled by legend by Norvell on Figure 4 of plaintiffs'

Exhibit 1 and as labeled by legend by Kohls on defendant's Exhibit 46 which is attached as "Appendix B."

23. Norvell and plaintiffs' patent expert Kohls both agreed that the word "annular" is commonly understood to describe a ring-shaped member having inner and outer confines. Plaintiffs' patent expert Kohls admitted that for all practical purposes, most of the air, apart from possible leakage, in the patented invention in suit comes through the "annular space" identified on defendant's Exhibit 46 ("Appendix B").

24. Plaintiffs' patent expert Kohls had no other way of describing the term "annular embracive air passage" used in claim 2 other than to revert to an "analogy" sketched on the bottom of Exhibit 1, which analogy is not referred to anywhere in the patent or in the text of the patent, or anywhere else in the file wrapper, since such "analogy" is merely a product of Kohls' mind.

25. Norvell admitted that the spacing relationship so that the spray coming out of the nozzle could take in the air necessary to create fog was a critical limitation.

26. Patent expert Kohls specifically identified the stream of air "having liquid particles of insecticide dispersed therein prior to its entry into the vaporizing barrel 62" (lines 22–28 of column 4, plaintiffs' Exhibit 1) by coloring the little triangular portion from the front of the nozzle to the front of the barrel red (cross hatched in red ink on defendant's Exhibit 46) ("Appendix B") and identified by the legend "portion of stream," at which axial spacing location the liquid particles are entrained by the air aspirated through the annular space.

27. Rule 2 of the Rules of Practice in patent cases provides that all business with the Patent Office should be transacted in writing.

28. Rule 133 of the Rules of Practice in patent cases specifies the terms and conditions under which interviews will be granted by the Patent Office and specifies that interviews should be arranged for in advance.

29. Plaintiffs' patent expert Kohls admitted that the majority of patent applications are handled by correspondence only.

30. Both the applicant and his attorney held an oral interview with the examiners of the Patent Office in connection with the application as originally filed on June 27, 1961.

31. Norvell, in company with his counsel, attended a second interview on May 9, 1962, with the examiner at the Patent Office in connection with the refiled application.

32. As stated in the patent in suit, "the flow of air into the vaporizer chamber is caused by, and only by the passage of insecticide spray into the chamber" (column 4, lines 50 et seq.). Thus, as further explained in the patent in suit, "When there is no insecticide spray passing into the vaporizer chamber, there is likewise no flow of air" (column 4, lines 48 et seq.). The insecticide actually drags or sucks the air in through the "annular space" labeled on plaintiff's Exhibit 1.

33. Norvell admitted that from his examination of the accused McGraw-Edison device, if there was no liquid pumped and the fan was going, the air would continue to be propelled, and that such operation was different from that described in his patent application.

34. In the accused McGraw-Edison device, air under positive pressure from the fan goes out of any space around the barrel, and there is no aspiration at that point. That fact was established by physical demonstration to the court. The outgoing air is depicted by arrows affixed by plaintiffs' patent expert Kohls to defendant's Exhibit 46 ("Appendix B").

35. Plaintiffs' engineering expert Oberto also admitted that the air supplied to the area immediately adjacent the separate openings in the wall sections of the plastic housing of the accused McGraw-Edison device would exhibit no

tendency for air to be sucked in, being under a positive pressure.

36. Kohls admitted with respect to the nozzle of the accused device there was no axial spacing relationship relative to the barrel and even protrudes a slight distance into the bore. The test demonstration of the accused device showed that residual oil fell in the barrel, thereby causing smoking during the heating period.

37. In order to remove the fan blower from the accused device, it is necessary to disassemble the device.

38. The patent expert of the plaintiffs, E. Eugene Kohls, is an employee of the lawyer for the plaintiffs and has been since 1921. The engineering expert of the plaintiffs, Edwin L. Oberto, is an officer of the involuntary plaintiff, B.V.I. No credible evidence was adduced by the plaintiff showing that aspiration occurs in the accused device in normal operation.

39. Plaintiffs have failed to establish infringement of claim 2 and/or to sustain the burden of proving infringement of claim 2.

### The Issue of Validity

40. The asserted distinction of the alleged invention from the prior art Austrian Patent No. 175,972 shows that the essential point of novelty relied upon by Norvell and which the Patent Office examiner was unable to find in a prior art reference involved the provision of means for delivering a solid stream of liquid from the reservoir to an atomizing nozzle under pressure, thereby to admix air with a solid liquid atomized spray of liquid particles solely by the aspirating action of the atomized spray, as specifically embodied in the precise structural configuration of the Figure 4 species, namely, the B.V.I. fogger, with the annular space between the external surface of the barrel and the collar and with the nozzle spaced axially from the barrel.

41. Section 112, paragraph 1, 35 U.S.C., of the 1952 Patent Act requires that the specification shall contain a written description of the invention in such full, clear, concise and exact terms as to enable a person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

42. Section 112, paragraph 2, 35 U.S.C., of the 1952 Patent Act requires that the specification of a patent conclude with one or more claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

43. Column 4, line 33, of the patent in suit ("Appendix A") contains incorrect information since the flash point of the oil is always exceeded by the vaporization temperature.

44. Since the term "annular embracive passageway" in claim 2 has no antecedent basis in the specification and since the subject matter of claim 2 in suit was added by amendment (in the continuation-in-part application) made after the B.V.I. device had been marketed, and since the term "annular space" applies specifically to an annular space characteristic of the B.V.I. commercial device located between the external surface of the barrel 60 and the annular collar 58 and not the location asserted by the plaintiffs in charging McGraw-Edison with infringement, claim 2 is fatally vague and indefinite, and claim 2 violates § 112, paragraph 2, of the 1952 Patent Act and is therefore invalid.

### Prior Art Justification

45. Each and every material element contained in the accused McGraw-Edison device has its exact counterpart functioning in the same way as in the expired prior art patent of Batt No. 2,070,038, the teachings of which are in the public domain.

46. Batt No. 2,070,038 describes a device for producing fog and bears on the same problem which Norvell had to solve.

47. Batt No. 2,070,038 clearly teaches the use of a nozzle 17, a reservoir 5, a pumping means for delivering a solid stream of liquid from the reservoir to the nozzle under pressure for ejecting from the nozzle solely liquid in an expanding cone of atomized spray 7, 8, 16, an elongate barrel 10 or elongated tube, means for heating the barrel 23, and a fan or blower 12. Moreover, the nozzle 17 is spaced radially from the walls of the tube 10.

48. In Batt No. 2,070,038, according to plaintiffs' engineering expert Oberto, with respect to the area inside of the tube but outside the divergent shape of the spray emitted from the nozzle 17, there is an "annular embracive air passage," and when atomization occurs in Batt, aspiration also occurs.

49. Inactivation of the fan blower 12 of Batt would produce aspiration entering the tube.

### Lack of Novelty, Utility and Obviousness Under §§ 101, 102 and 103

50. Plaintiffs' expert engineer, Edwin L. Oberto, vice president in charge of engineering of B.V.I., specifically selected Batt Patent No. 2,070,038 and Tomasovich Patent No. 2,736,987, neither of which was cited by the U. S. Patent Office as being specifically pertinent to the subject matter of the suit in that Tomasovich and Batt cover devices which are intended to produce fog in the same sense as the subject matter at issue.

51. All of the individual mechanical elements of claim 2 are old and well known.

52. The general mechanical setup of the patented fogger is just a conventional B.V.I. paint sprayer, and Norvell himself successively disclaimed novelty in each of the separate elements recited in claim 2 of the patent in suit including the nozzle, the reservoir, the means for delivering a solid stream of liquid from the reservoir to the nozzle under pressure for ejecting from the nozzle solely liquid in an expanding cone of atomized spray,

an elongate barrel, and means for heating said barrel.

53. Not only are the individual mechanical elements of the patented invention old and well known, but the "combination" of such old elements was achieved by others long before Norvell, including Doug Anderson, Batt, Tomasovich, and Gerardo Collardin.

### The Doug Anderson Evidence

54. Doug Anderson, a professional industrial designer associated with Dave Chapman Inc. of Chicago, Illinois, was regularly employed by B.V.I. in connection with its product line of paint sprayers prior to the invention of the patent in suit by Norvell.

55. On July 24, 1959, Doug Anderson combined in a sketch a B.V.I. paint sprayer similar to a Model VS–800 paint sprayer then commercially marketed by B.V.I. and a heating element attachment, thereby establishing a teaching demonstrating it was obvious to a mechanic skilled in the art that all of the old elements of the alleged Norvell invention could be combined for the purpose of providing an insecticide fogger.

56. The suggested "combination" of a heating element attachment with a B.V.I. sprayer was also described and submitted in writing by Doug Anderson to the B.V.I. products planning committee in a letter dated July 24, 1959.

57. The teachings of Doug Anderson to B.V.I. were entirely adequate for a person skilled in the art to achieve the so-called combination of the patent in suit because Al Simmons, a B.V.I. employee, built a fogging unit and attached it to a B.V.I. Model VS–800 sprayer. President Bell of B.V.I. used that Doug Anderson fogger very successfully, as he reported in a written letter to Doug Anderson in September 1960.

58. At the time of the claimed invention of Norvell, it was obvious to a mechanic skilled in the art that a heating element attachment could be added to the B.V.I. Model VS–800 sprayer and thereby produce an insecticide fogger which is both substantially structurally and func-

tionally responsive to the requirements of claim 2, as well as capable of practicing the method of claim 1.

59. Claim 1 in issue does not define invention in view of the July 24, 1959, teachings of Doug Anderson.

60. Claim 2 in issue does not define invention in view of the July 24, 1959, teachings of Doug Anderson.

61. The Doug Anderson evidence was not before the Patent Office examiner during the examination of the application of the patent in suit, nor was the attention of the Patent Office called to such evidence, and, therefore, the statutory presumption of validity of the patent in suit does not prevail over such evidence.

62. The fact that the Doug Anderson development was not immediately commercially exploited by B.V.I. does not render it any less pertinent as anticipatory evidence prior to the first dates of invention claimed by Norvell since Norvell did not even become interested in insecticide foggers until August of 1959 when Norvell's father received a so-called Johnson fogger in the mail.

*The Tomasovich Patent No. 2,736,987*

63. Tomasovich shows the general organization of an insecticide distributor which is portable and includes a nozzle 17, a reservoir 10, a means for delivering a solid stream of liquid from the reservoir to the nozzle under pressure in an expanding cone of atomized spray shown at 37, a heated vaporizer 22 having a heating element 23 and located specifically in alignment with the nozzle 17 so that it is directly in the line of the spray from the nozzle. The nozzle 17 and the heated vaporizer 22 are in spaced relationship. As admitted by the plaintiffs' engineering expert Oberto, the principal difference between the teachings of Tomasovich and the Norvell patent lies in the shape of the vaporizer since Tomasovich has a flat plate 22, whereas Norvell has a tubular barrel 60, but in engineering function, the end result is to produce a fog.

64. There is no novelty in the heating barrel, a standard part available commercially from Tuttle Company in Tecumseh, Michigan, and such barrel can and would be readily substituted for the Tomasovich flat plate 22 by a person skilled in the art without invention and as a matter of choice.

65. Tomasovich 2,736,987 was not cited by the U. S. Patent Office as a reference against the Norvell patent applications, and therefore the statutory presumption of validity of the patent in suit does not prevail over Tomasovich 2,736,987.

66. All of the claims presented in the second application of Norvell were rejected in view of the pertinence of the Austrian Patent No. 175,972. After such rejection, the distinction urged to the Patent Office was that instead of an injector type pump, the invention of Norvell had a pump such as in the B.V.I. paint sprayer that pumps solid liquid rather than atomized spray. The last element of the claim, patent claim 2, reading "whereby the liquid spray entering the barrel controls the amount of air admixed therewith," does not appear in claim 2 of the application as filed and is a part of the claim that was allowed and therefore one of the reasons why the examiner reached the conclusion that the claim was allowable according to the plaintiffs' own patent expert Kohls.

67. Tomasovich 2,736,987 is an anticipatory reference against the Norvell invention and teaches the very feature which was urged as a distinction over the Austrian Patent No. 175,972; namely, a pump for pumping solid liquid in an insecticide fogger and for the purpose of producing an expanding cone of spray.

68. Claims 1 and 2 in issue are both invalid for lack of invention in view of Tomasovich 2,736,987 standing alone or when considered in combination with the Austrian Patent No. 175,972, since a person skilled in the art could and would readily substitute the Tomasovich pump for the injector pump in the structure of

Austrian Patent No. 175,972 without exercise of invention and as a matter of engineering choice.

### The British Patent No. 734,964

69. Gerardo Collardin, the patentee of British Patent No. 734,964, combined the essential old elements of Norvell since Figure 5 of that patent, identified as the most pertinent figure by the Patent Office examiner, shows a nozzle 1 in aligned position with a tubular jacket 37a having electric heaters 39.

70. Both the method of claim 1 and the structure of claim 2 would appear to be completely anticipated by the British Patent No. 734,964 which was not cited or applied by the U. S. Patent Office examiner in the second continuation-in-part application of Norvell.

### Rex Company Prior Public Use

71. Claim 2 of the patent in suit is limited by file wrapper estoppel to the "annular space" species of Figure 4, added by amendment in the newly-filed continuation-in-part application filed January 15, 1962.

72. Rex Company offered for public use and sale in September 1960 an insecticide fogger corresponding in structure and operation to the fogger shown in Figure 1 of the patent in suit.

73. In view of the prior public use and sale by the Rex Company in September 1960, claim 2 is invalid under § 102 of the patent statute since it is not supported by the parent application and does not define inventive novelty over the subject matter which was in prior public use and on sale more than a year before January 15, 1962.

### Scope and Content of the Prior Art

74. The scope and content of the prior art is delineated by the fact that all of the individual mechanical elements of the alleged invention of the patent in suit were old as admitted by the plaintiff and patentee Norvell; by the fact that such "combination" of old elements had been accomplished in accordance with the teachings of noncited reference patents, Batt 2,070,038 and Tomasovich 2,736,987; by the teachings to B.V.I. of Doug Anderson as of July 24, 1959; by the subsequent response to such teachings by Al Simmons in combining a B.V.I. Model VS–800 sprayer with a heating element attachment to provide an insecticide fogger; by Figure 5 of the British Patent No. 734,964 cited against the parent application but not again cited or relied upon by the examiner in the later continuation-in-part application; and by the prior art Austrian Patent No. 175,972 cited in the continuation-in-part application.

### Differences Between the Prior Art and the Claims at Issue

75. The plaintiff and patentee Norvell admitted that the only difference between his invention and the prior art Austrian Patent No. 175,972 was that the reference utilizes an auxiliary air pump to bring air into tube 4, whereas in the Norvell invention there was provided a pump 54, supplied as a part of the B.V.I. paint sprayer.

76. The only difference between the Norvell invention and Tomasovich 2,736,-987 is that the atomizer 22 of Tomasovich is a flat plate instead of a tubular barrel, but the end result is to produce a fog. Heating barrels were commercially available from the Tuttle Company in Tecumseh, Michigan.

77. To develop the distinction of the B.V.I. pump 54 over the Austrian Patent No. 175,972, method claim 1 was amended to specify the use of "a solid liquid," thereby to provide the distinguishing step of "admixing air with a solid liquid atomized spray of liquid particles solely by the aspirating action of said atomized spray." Application claim 5 (now patent claim 2) was contemporaneously amended to specify the utilization of: "and means for delivering a solid stream of the liquid from said reservoir to said nozzle under pressure for ejecting from the nozzle solely liquid in an expanding cone of atomized spray."

78. The limitations added to method claim 1 and to application claim 5, now patent claim 2, in order to distinguish over the Austrian Patent No. 175,972 are fully and completely disclosed in Tomasovich 2,736,987 in the selfsame organization of an insecticide fogger and for the same purpose, and when added to such claims perform no new or different function or accomplish any different result or change or modification in the operation of the method of dispersion, or the insecticide fogger of the respective claims to which such limitations were added.

### The Level of Ordinary Skill in the Pertinent Art

79. Norvell had no special technical skills and when confronted with the problem of constructing a fogger realized that the solution was obvious just from thinking about an automobile engine.

80. The level of skill in the pertinent art appears to be that of men having long experience in the art of atomization and vaporization; for example, the manufacture of small appliances such as paint sprayers exemplified by VS–800 paint sprayer of B.V.I. already in full production in July 1959.

81. From an analysis of the subtests of obviousness and from all of the factors involved in the present circumstances, including the problem faced, the solution provided, the prior art, the differences between the claims that issued in the prior art and the level of ordinary skill in the pertinent art, the subject matter of the patent would have been obvious to a person skilled in the art.

### Fraud in the Patent Office

82. Defendant, McGraw-Edison, has charged that Norvel and B.V.I. committed a fraud upon the Patent Office and violated § 2 of the Sherman Act by engaging in a conspiracy against McGraw-Edison with regard to production and sale of insecticide foggers.

83. In my opinion, McGraw-Edison has failed to establish by clear and satisfactory evidence that there was any willful fraud on the Patent Office or that the parties conspired against McGraw-Edison. This portion of the counterclaim will, therefore, be dismissed.

### CONCLUSIONS OF LAW

84. The burden is on the plaintiffs to prove infringement by a preponderance of evidence. Becker v. Webcor Inc., 289 F.2d 357, 360 (7th Cir. 1961); Fife Mfg. Co. v. Stanford Eng. Co., 299 F.2d 223, 226 (7th Cir. 1962). Infringement is not made out by a mere word comparison between the claims in issue and the accused device; there must be real identity of means, operation, and result. Skirow v. Roberts Colonial House, Inc., 361 F.2d 388, 390 (7th Cir. 1966); North Star Ice Equipment Co. v. Akshun Mfg. Co., 301 F.2d 882, 886 (7th Cir. 1962); Weil Pump Co. v. Chicago Pump Co., 74 F.2d 13, 17 (7th Cir. 1934). Infringement should not be determined by comparison of plaintiffs' commercial device with defendant's commercial device. It should be determined by reading of the claims on the accused device in the light of the patent in suit, the prior art, and the file history of such patent. Graham v. John Deere Co., 383 U.S. 1, 24, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217, 61 S.Ct. 235, 85 L.Ed. 132 (1940); Atkins v. Gordon, 86 F.2d 595, 596 (7th Cir. 1936); Skirow v. Roberts Colonial House, Inc., 361 F.2d 388, 390 (7th Cir. 1966); North Star Ice Equipment Co. v. Akshun Mfg. Co., 301 F.2d 882, 886 (7th Cir. 1962); Scherbatskoy v. United States Steel Corp., 287 F.2d 552, 556 (7th Cir. 1961); Peters & Russell v. Dorfman, 188 F.2d 711, 713 (7th Cir. 1951); Bauer v. Yetter Mfg. Co. Inc., 205 F.Supp. 904, 909 (S.D.Ill.1962), affirmed 315 F.2d 377 (7th Cir. 1963).

85. A patentee should not be permitted to claim infringement of a device embodying that which he relied upon to distinguish from the prior art. Skirow v. Roberts Colonial House, Inc.,

361 F.2d 388, 390 (7th Cir. 1966); Fife Mfg. Co. v. Stanford Eng. Co., 299 F.2d 223, 226 (7th Cir. 1962).

86. Batt 2,070,038 provides expired prior art justification for every material element and function of the McGraw-Edison device and therefore anticipates the patented invention as earlier, if asserted against McGraw-Edison, because that which infringes, if later, would anticipate, if earlier. Charles Peckat Mfg. Co. v. Jacobs, 178 F.2d 794, 800 (7th Cir. 1949); Knapp v. Morss, 150 U.S. 221, 228, 14 S.Ct. 81, 37 L.Ed. 1059 (1893); M & R Dietetic Laboratories, Inc. v. Dean Milk Company, 203 F.Supp. 130, 142 (D.C.Ill.1961).

87. Despite the absence of infringement, it is better practice for a court to inquire fully into the validity of a patent because of the public interest. Validity is also in issue because of the counterclaim of the defendant. Sinclair & Carroll Co. v. Interchemical Co., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); Tappan Co. v. General Motors Corp., 380 F.2d 888, 890 (6th Cir. 1967); M.O.S. Corporation v. John I. Haas Co., Inc., 375 F.2d 614, 616 (9th Cir. 1967); Borden Company v. Clearfield Cheese Co., Inc., 369 F.2d 96, 99–100 (3rd Cir. 1966).

88. The presumption of validity of a patent does not exist as against evidence of prior art not before the Patent Office. T. P. Laboratories, Inc. v. Huge, 371 F.2d 231, 234 (7th Cir. 1966). Everest & Jennings, Inc. v. Colson Corp., 371 F.2d 240, 242 (7th Cir. 1967); Skirow v. Roberts Colonial House, Inc., 361 F.2d 388, 390 (7th Cir. 1966); Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100, 105 (7th Cir. 1957), cert. denied 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762.

89. Even one prior art reference not considered by the Patent Office can suffice to overthrow the presumption of validity. Simmons Company v. Hill-Rom Company, 352 F.2d 886, 888 (7th Cir. 1965); Jay Bee Manufacturing Corp. v. Ajax Hardware Mfg. Corp., 287 F.2d 228, 229 (9th Cir. 1961).

90. The 1952 Patent Act, 35 U.S.C. Patents, sets out the conditions of patentability in three sections which have been analyzed by the United States Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966): novelty and utility as articulated and defined in §§ 101 and 102 and nonobviousness as set out in § 103.

91. Combination patent claims are to be scrutinized with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

92. Any invention depending upon a combination of old and well-known elements must pass a rather severe test. Toro Manufacturing Corp. v. Jacobson Manufacturing Co., 357 F.2d 901, 904 (7th Cir. 1966).

93. Tomasovich, 2,736,987 was not cited by the U. S. Patent Office as a reference against the Norvell patent applications, and the disclosure of Tomasovich completely invalidates both claims 1 and 2 under § 102 and/or § 103 of the Patent Statute, 35 U.S.C.

94. Batt 2,070,038 was not cited by the Patent Office against the Norvell patent applications and completely invalidates both claims 1 and 2 under § 102 and/or § 103 of the Patent Statute, 35 U.S.C.

95. The claims of Norvell, including both method claim 1 and apparatus claim 2, are invalid under § 102 and/or § 103 of the Patent Statute, 35 U.S.C., over Figure 5 of the British Patent No. 734,964.

96. Claim 2 of the patent in suit is clearly invalid under § 102 of the Patent Statute, 35 U.S.C., in view of the prior public use and sale by Rex Company in September 1960 of the insecticide foggers corresponding to Figure 1 of the patent in suit.

97. Under § 103 of the Patent Statute, 35 U.S.C., the scope and content of the prior art are to be determined, differ-

ences between the prior art and the claims at issue are to be ascertained, and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Gass v. Montgomery Ward & Co., 387 F.2d 129 (7th Cir. 1967). Based upon analysis of all of the subtests of obviousness suggested by the United States Supreme Court in Graham v. John Deere and from all of the factors developed in the record, it is concluded as a matter of law that the subject matter of the patented invention would have been obvious to a person skilled in the art, and both claims 1 and 2 are void for obviousness under § 103 of the Patent Statute, 35 U.S.C.

98. Claim 2 of the patent in suit is ambiguous, indefinite, and vague and hence void under § 112 of the Patent Statute; parts of the specification are erroneous in violation of § 112. Pambello v. Hamilton Cosco, Inc., 377 F.2d 445 (7th Cir. 1967).

99. One indefinite clause in a claim renders such claim as a whole indefinite. Endevco Corp. v. Chicago Dynamic Industries, Inc., 268 F.Supp. 640, 654 (D.C. Ill.1967).

 100. Neither the presumption of validity of a patent nor commercial success of the patented product should be permitted to override a clear conviction of invalidity, especially with respect to prior art devices and patents not considered alone or in view of patent references not considered by the Patent Office examiner. Skirow v. Roberts Colonial House, Inc., 361 F.2d 388, 390 (7th Cir. 1966); Senco Products, Inc. v. Fastener Corp., 269 F.2d 33, 34 (7th Cir. 1959); T. P. Laboratories, Inc. v. Huge, 371 F.2d 231 (7th Cir. 1966); Century Industries, Inc. v. Wieboldt Stores, Inc., 263 F.2d 934, 937 (7th Cir. 1959); Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100, 105 (7th Cir. 1957); Schreyer v. Chicago Moto Coil Corp., 118 F.2d 852, 857 (7th Cir. 1941);

Siekert and Baum Stationery Co. v. Stationers Looseleaf Co., 51 F.2d 326, 329 (7th Cir. 1931).

 101. Defendant does not infringe claim 1 of the Norvell Patent No. 3,069,092.

102. Defendant does not infringe claim 2 of the Norvell Patent No. 3,069,- 092.

103. If construed to be of scope sufficient to embrace defendant's insecticide fogger, the Norvell Patent No. 3,069,092 is invalid because the subject matter thereof does not involve invention:

(a) Over the teachings of Doug Anderson, as conceived July 24, 1969;

(b) Over the teaching of Gerardo Collardin in British Patent No. 734,964;

(c) Over the teaching of Batt 2,070,038;

(d) Over the teaching of Tomasovich 2,736,987;

(e) Over the teaching of the Austrian Patent No. 175,972, when modified, as one skilled in the art would be expected to modify it, when it is desired to put in a pump-to-pump solid liquid to the nozzle as taught in Tomasovich 2,736,987.

104. The Norvell-patent is invalid because the subject matter thereof was not the invention of Norvell.

105. Claim 2 of Norvell Patent No. 3,069,092 is invalid because it does not involve invention over the Rex Company subject matter which was in public use and on sale more than a year before the filing date of the pertinent application of Norvell on January 15, 1962.

106. The complaint of the plaintiffs should be dismissed on its merits with costs and attorneys' fees, and the counterclaim of the defendant should be sustained except for that portion which alleges fraud and seeks damages based on fraud.

107. It is ordered that the clerk of court enter judgment forthwith for the defendant, McGraw-Edison Company, in accordance with these findings of fact and conclusions of law.

APPENDIX A

UNITED STATES DISTRICT COURT
EASTERN DIST. OF WISCONSIN
PLT _____
DFT _____
DEPUTY CLERK __JFY__

Dec. 18, 1962 E. C. NORVELL, JR 3,069,092
 LIQUID VAPORIZER

Filed Jan. 15, 1962 3 Sheets—Sheet 1

*Fig. 1*

PLAINTIFF'S
EXHIBIT
_____

*Fig. 3*

O.D

I.D.

*Fig. 2*

annular embracive
air passage

INVENTOR.
EDMUND C. NORVELL JR.
BY
Malcolm W. Fraser
ATTORNEY .

[A2314]

Dec. 18, 1962 E. C. NORVELL, JR 3,069,092

LIQUID VAPORIZER

Filed Jan. 15, 1962 3 Sheets—Sheet 2

Figure 4

INVENTOR
EDMUND C. NORVELL, JR.

BY

*Malcolm W. Fraser*

ATTORNEY

[A2315]

Dec. 18, 1962 E. C. NORVELL, JR 3,069,092
 LIQUID VAPORIZER

Filed Jan. 15, 1962 3 Sheets-Sheet 3

_Fig._ 5

_Fig._ 6

_Fig._ 7

INVENTOR
EDMUND C. NORVELL JR.

BY Malcolm W. Fraser

ATTORNEY

[A2316]

# United States Patent Office

3,069,092
Patented Dec. 18, 1962

**1**

3,069,092
LIQUID VAPORIZER
Edmund C. Norvell, Jr., 435 Dennis St., Adrian, Mich.
Filed Jan. 15, 1962, Ser. No. 168,004
2 Claims. (Cl. 239—133)

This invention relates to vaporizers but more particularly to vaporizers for liquids, such as insecticides for creating a fog to exterminate or repel insects by an effective coverage of the area to be treated.

An object is to produce a simple and efficient liquid vaporizer which has the new and improved features of construction, arrangement and operation hereinafter described.

Another object is to produce a vaporizer which is suitably heated and into which atomized liquid is introduced for breaking up the atomized particles through the medium of heat and expelling the same in the form of a fog.

A further object is to produce an attachment for liquid atomizers which receives the atomized liquid and at the same time aspirates outside air for mixture therewith, heats the air-spray mixture in such manner as to break up same into smaller, more volatile particles, and then discharges the same as a fog in substantially continuous manner.

A still further object is to produce a spray gun-vaporizer assembly having novel features by which atomized liquid mixed with air is heated for creating a vapor which may be forcefully discharged in a vapor form.

Other objects and advantages of the invention will hereinafter appear, and, for purposes of illustration but not of limitation, an embodiment of the invention is shown on the accompanying drawings, in which

FIGURE 1 is a side elevation of a spray gun and vaporizer assembly;

FIGURE 2 is an enlarged fragmentary side view of the discharge end portion of the spray gun and the adjacent end portion of the vaporizer barrel, the parts being separated from each other for purposes of clarity;

FIGURE 3 is a transverse sectional view substantially on the line 3—3 of FIGURE 2;

FIGURE 4 is a side elevational view partially in section and with certain portions cut away of a modified version of the spray gun and vaporizer assembly illustrated in FIGURES 1 to 3;

FIGURE 5 is a perspective view of the vaporizer barrel of the assembly illustrated in FIGURE 4;

FIGURE 6 is a top plan view with portions cut away to more clearly illustrate the vaporizer barrel illustrated in FIGURE 5; and

FIGURE 7 is a sectional view of the vaporizer barrel taken along lines 7—7 of FIGURE 6.

The illustrated embodiment of the invention of FIGURES 1, 2, and 3 comprises an electrically operated liquid atomizer or spray gun 10, which, as shown, is provided with a body 11 having a trigger handle 12, a lead cord 12a, a detachable liquid-containing jar 13 and an atomizing nozzle 14. The nozzle 14, as shown, is slightly tapered and is provided with a series of parallel outwardly projecting horizontal ridges 15.

The particular form of the atomizer forms no part of the present invention. Suffice it to say that in the form shown the liquid in the jar 13 is forced by pump action or otherwise therefrom to the outside in spray form through the atomizing nozzle 14. Any satisfactory atomizer may be employed, either power or hand operated, so long as it discharges the liquid therefrom in atomized spray form. A suitable spray gun for this purpose is the BVI electric sprayer manufactured by Burgess Vibrocrafters, Inc., of Grayslake, Illinois, and this reference

**2**

is made since the device illustrated on the drawings is one sold by such concern and one which in practice has been satisfactory.

More particularly in accordance with this invention, a vaporizer 16 is attached to the atomizer nozzle 14 and receives the spray of atomized liquid therefrom. The vaporizer 16 is in the form of an elongate cylindrical barrel 17 which may be of aluminum. Embedded in the wall of the barrel 17 is a coil 18, which may be of Nichrome wire, and, as shown, the coil is suitably insulated from the body of the barrel 17 and extends substantially throughout the length of the barrel. The terminals of the coil lead to a suitable thermostat 19 from which extends a lead cord 20 for supplying electrical energy. Within the coil 18 and extending from end to end of the barrel is a central metallic tube 21, the inside of which is smooth and free from any burrs or irregularities. The smoothness of the inside of the tube 21 is found important for carrying out the efficient operation of the vaporizing barrel.

Integral with the barrel 17 and projecting rearwardly therefrom is a pair of bracket arms 22 which are integral at their rear ends with an attaching ring 23. In screw threaded engagement with the ring 23 are three equidistantly spaced set screws 24, and at the lower part of the ring is a forwardly extending relatively short arm 25 which is also integral with the ring. The arms 22 and 25 are equidistantly spaced from each other as shown in FIGURE 3.

The vaporizer 16 is applied to the atomizer 10 by slipping the ring 23 over the outside of the atomizing nozzle 14. The set screws 24 enter spaces between the ridges 15, and, when tightened, the vaporizing barrel is secured in position of use. Preferably the relatively short under arm 25 has its free end approximately flush with the forward end of the nozzle 14.

It will be noted that a substantial space exists between the front end of the atomizing nozzle 14 and the rear end of the barrel 17 and the spray discharged from the atomizing nozzle 14 passes through an open space before it enters the barrel 17. As a result, outside air is aspirated into the barrel by the atomized liquid and this provides an air-liquid mixture, which is found to be important for achieving the desired vaporization of the liquid.

The vaporizing barrel 16 must be heated to a temperature of the order of 650° F. and such temperature is maintained by the thermostat 19. Usually several minutes are required to bring the barrel to the proper temperature, then by energizing the atomizer 10, the atomized liquid is introduced under pressure into the barrel 17, thereby drawing in a quantity of outside air along with it. The atomized particles upon impingement against the inside of the hot tube 21 breaks up the atomized particles into smaller, more volatile particles resulting in vaporization and emitting a fog from the discharge end of the barrel. This will proceed continuously so long as the atomized liquid is forced into the barrel.

Although the device may be used for the atomization of many different liquids, it is found particularly useful in the atomization of insecticides, which usually have a light oil base, and vaporize most satisfactorily, the fog completely filling a room or other closed space for effectively killing insects upon contact. Manifestly the insecticide employed should be of such chemical composition that it can be vaporized without creating a harmful gas or residue. The device also has utility around patios, lawns and open areas for the control of mosquitoes, flies and similar insects.

It should be understood that the temperature within the vaporizing barrel 16 will have to be adjusted accord-

ing to the particular liquid employed. Some liquids require a higher or a somewhat lower temperature to effect satisfactory vaporization. Likewise it will be understood that the length and diameter of the vaporizing barrel 16 is so chosen as to effect the most efficient operation with respect to a particular liquid. It is emphasized, however, that the vaporizing barrel 16 must be in direct alignment with the atomizing nozzle 14 so that the spray will properly be projected inside the barrel and that adequate outside air will be aspirated to secure the proper air-liquid mixture to secure the desired vaporization.

Referring to another embodiment of the invention illustrated in FIGURES 4, 5, 6, and 7, there is shown a liquid atomizer and vaporizer assembly comprising an electrically operated liquid atomizer 30 and an electrically heated liquid vaporizing chamber 32. The liquid atomizer 30 is provided with a body 34 having a handle 36, a trigger actuated switch 38, electrical power leads 40, a detachable liquid container 42, and an atomizing nozzle 44.

Electrical energy is supplied to a solenoid 46, disposed within the body 34, through leads 40. The armature of the solenoid 46 is effective to impart vertical movement to a bar 48 which is pivotally mounted at one end while the other is in contact with a spring biased pump piston rod 50. The vertical movement of the bar 48 is limited and controlled by a screw controlled adjustment assembly 52. By the adjustment of the device 52 the length of the stroke imparted to the pump piston rod may either be shortened or lengthened.

The piston rod 50 is associated with a pump 54, disposed within the liquid container 42, and is provided with a conduit or passageway 56 through which liquid may pass to the outlet thereof which is provided with the nozzle 44. It will be noted that the nozzle 44 is disposed within an annular space defined by a forwardly extending annular collar 58 which is typically an integral extension of the body 34.

The vaporizing chamber 32 is comprised of an outer casing 60 and an inner coaxially extending tapered barrel 62 spaced therefrom by a pair of insulating end spacer elements 64. Within the space between the outer casing 60 and the barrel 62, there is provided an insulating material 66. It has been found that by tapering the barrel 62, additional thrust is imparted to the vaporized material.

The barrel 62 is heated by electrical current which is supplied from the electrical leads 40 through a pair of bayonet type prong elements 68 which extend from the barrel 62 through suitable apertures in the rear spacer element 64 and are adapted to be received in properly disposed receptacles within the body 34. The receptacles, not shown, are electrically coupled to the source of electrical energy through the leads 40. In addition to functioning as a path for electrical current, the prong elements 68 provide a strong separable mechanical connection between the liquid atomizer 30 and the vaporizing chamber 32.

To maintain a predetermined temperature of the barrel 62, there is provided a thermostat control unit 70 having terminals 72 and 74 which are connected through suitable electrically conductive leads to associated barrel terminals 76 and 78, respectively. The thermostat 70 functions to interrupt the flow of current heating the barrel 62 when the barrel temperature exceeds a predetermined, typically about 575° F., value.

In operation, the assembly is initially connected to the normal line current through the lead 40 which immediately causes a flow of current through the vaporizing barrel 62 to heat the same. Typically, a warm-up time of approximately six minutes is necessary for complete pre-heating of the vaporizing barrel 62. After the barrel 62 has reached the predetermined temperature which typically takes about six minutes the operator pulls the trigger 38 on the underside of the handle 36 which establishes an electrical current path to the solenoid 46

to effectively energize the same and cause the piston rod 50 to be reciprocated through a stroke length determined or limited by the adjustment device 52 which regulates the rate of liquid flow. The pump 54, driven by the piston rod 50, forces the liquid within the container 42 upwardly through the outlet passage 56 and thence through the atomizing nozzle 44.

The nozzle 44 feeds atomized liquid through a spray pattern in the form of a completely filled cone the sides of which have an angularity of the order of 40° into the thermostatically controlled barrel 62 of the vaporizing chamber 32. The transient liquid absorbs heat within the barrel 62 in sufficient amount to cause vaporization thereof and surges from the outlet end of the barrel in the form of a dense fog. It will be appreciated that the atomized liquid emitted from the nozzle has not been mixed with any air until it leaves the nozzle 44 at which point the particles of atomized liquid effectively entrain air from within the zone between the rear portion of the vaporizing chamber 32 and the forward end of the atomizer 30. The velocity of the emergent atomized liquid stream from the nozzle 44 enables the capture of air which is aspirated to the aforesaid zone through the annular space between the outer surface of the casing 60 and the inner surface of the annular collar 58 thereby forming a stream of air having liquid particles of insecticide dispersed therein prior to its entry into the vaporizing barrel 62. The amount of air entering the vaporization barrel 62 is determined by the atomized spray emitted from the nozzle 44 and is important with respect to the overall effective operation and safety of the invention.

Since the majority of commercially available liquid insecticides include inflammable components, extreme attention must be given toward preventing the temperature of the mixture from exceeding its flash point. In the operation of the vaporizer of the invention the amount of air passing through the vaporizing chamber is dependent upon and proportioned at all times to the rate of flow of atomized spray from the nozzle. Thus when because of depletion of the insecticide mixture or obstruction of the spray nozzle or for any other reason, the flow of insecticide spray into the vaporizer chamber stops the flow of air likewise stops and is immediately resumed when the insecticide spray is restarted. As a result there is always an adequate air flow to carry the fogged insecticide out of the chamber and to prevent thereby any accumulation of liquid insecticide in the chamber. When there is no insecticide spray passing into the vaporizer chamber there is likewise no flow of air. Moreover, since the flow of air into the vaporizer chamber is caused by, and only by, the passage of insecticide spray into the chamber accidental or inadvertent shutting off of the air flow becomes impossible so that no passage of spray into the chamber can occur without carrying with it sufficient air to prevent any retention or accumulation of insecticide in the chamber.

A typical operating example of the apparatus embodying the principles of the invention has been found to have the following dimensions:

| | Inches |
|---|---|
| Distance from nozzle 44 to inlet of barrel 62 | .4375 |
| Diameter of inlet of barrel 62 | .875 |
| Diameter of outlet of barrel 62 | .750 |
| Length of barrel 62 | 6 |

In practice it is found that apparatus having the above dimensions and equipped with a discharge orifice of the nozzle of the order of .0135 inch and employing a liquid pressure of approximately 40 pounds per square inch, a spray volume of between two and one-half and four and one-half ounces per minute is achieved with a spray velocity per second at the discharge orifice of the nozzle 44 of approximately seventy five feet. This provides at the discharge orifice of the nozzle 44 a completely filled cone of spray having an angularity of about 40°.

**3,069,092**

**5**

Among the numerous advantages of the invention is that a principal cause of the clogging and plugging-up of apparatus of the prior art has been eliminated. Since the insecticide used in the apparatus is not heated until after it is atomized, the pumping and atomizing equipment is maintained free from the sticky and gummy substances which may result when the insecticides are heated. Clearly this advantage results in eliminating the heretofore problem of frequent dismantling and cleaning of the parts of the atomizing equipment. Further, since the orifice in the atomizer remains unclogged, a steady and even flow of atomized particles of the liquid results.

A further advantage resides in the fact that this apparatus can advantageously employ insecticide formulations available on the market and does not require special formulation to secure desired results. This is due to the fact that the heat necessary for satisfactory operation is relatively low so that the insecticide is neither broken down nor does it create a substance which gums up and in short order renders the apparatus useless and not infrequently creates a dangerous fire hazard.

Numerous changes in details of construction, arrangement and choice of materials may be effected without departing from the spirit of the invention, especially as defined in the appended claims.

This application is a continuation-in-part application of my copending application Serial No. 59,713 entitled "Liquid Vaporizer" filed September 30, 1960, now abandoned.

I claim:

1. A method of forming a dispersion of vaporized liquid insecticide in a current of air comprising admixing

**6**

air with a solid liquid atomized spray of liquid particles solely by the aspirating action of said atomized spray and passing the mixture thereby produced through an elongated cylindrical zone while radiating heat into the mixture from the boundary of said zone to effect vaporization of the liquid particles therein.

2. A vaporizer for liquid insecticides and the like comprising means including a nozzle, a reservoir for the liquid, and means for delivering a solid stream of the liquid from said reservoir to said nozzle under pressure for ejecting from the nozzle solely liquid in an expanding cone of atomized spray; an elongate barrel aligned in front of and spaced a relatively short distance from said nozzle to define an annular embracive air passage about the periphery of said spray whereby a current of air is aspirated by said spray from said embracive air passage into said barrel and forced into intimate admixture with the spray; and means for heating said barrel to effect vaporization of the spray particles in the mixture of air and spray passing through said barrel whereby the liquid spray entering the barrel controls the amount of air admixed therewith.

**References Cited in the file of this patent**

**UNITED STATES PATENTS**

| | | |
|---|---|---|
| 2,123,604 | Johnson | July 12, 1938 |
| 2,980,786 | Chilton | Apr. 18, 1961 |

**FOREIGN PATENTS**

| | | |
|---|---|---|
| 175,972 | Austria | Sept. 10, 1953 |
| 1,167,354 | France | July 7, 1958 |
| 1,211,461 | France | Oct. 12, 1959 |